[Nos. 15014-3-III; 15040-2-III.    Division Three.    December 9, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. CAROL M.D., ET AL., *Appellants*.

*Robert C. Van Siclen* of *Van Siclen & Stocks; Hugh M.*

*Spall, Jr.*; *Eric J Nielsen* and *James R. Dixon* of *Nielsen, Broman & Associates, P.L.L.C.*; (and *Robert Rosenthal*, of counsel), for appellants.

*Carol M.D.*, pro se.

*Gary A. Riesen, Prosecuting Attorney*, and *Roy S. Fore, Deputy*, for respondent.

SCHULTHEIS, A.C.J. — ER 803(a)(4) excepts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment . . . ." The admission of such statements at trial does not violate the Confrontation Clause because their reliability is insured by the declarant's self-interest in providing accurate information to obtain effective medical treatment. In this case, we are asked to decide whether the trial court properly admitted under ER 803(a)(4) statements made by a child to her counselor describing sexual abuse by her parents. We conclude the court admitted those statements without proper foundation. There was no affirmative showing the child understood she needed to give accurate and truthful responses to the counselor's question, to assist the counselor in treating her. We therefore reverse the convictions of Mark D. and Carol D. for first degree rape of a child and complicity to commit first degree child molestation.

At the time these charges arose, Mr. and Mrs. D. lived with their five children in Wenatchee. Their eldest daughter, S.D., was 16 years old. S.D.'s brother, J.D., was 14; her sisters were E.D., age 13; A.D., age 11; and M.D., age 9.

In mid-December 1994, Mr. and Mrs. D. discovered that J.D. and E.D. were engaging in sexual conduct with each

other. They sought counseling for them, and were referred to Child Protective Services (CPS). CPS immediately removed the couple's two foster children from their home. The foster children were living with Mr. and Mrs. D. while their own parents served sentences on convictions for child sexual abuse. Soon thereafter, Mr. and Mrs. D. sent their son to live with Mrs. D.'s sister in Moses Lake. They then applied for the return of the foster children to their home. Mrs. D. explained J.D. had been molested in the past by a neighbor boy. She and her husband believed it was necessary to remove him from the presence of their other children while he received counseling.

Detective Robert Perez and CPS caseworker supervisor Timothy Abbey interviewed J.D. in Moses Lake. According to J.D., Detective Perez started the interview by asking him if his parents had abused him. According to Detective Perez, he asked J.D. if he had had sexual contact with anyone other than E.D. J.D. at first denied any sexual contact with his parents, then admitted he had engaged in intercourse with his mother. He told Detective Perez he also had witnessed his parents sexually abusing his sisters. J.D. testified to these same facts at the trial of his parents. But he admitted he had told his foster mother that many of his allegations were not true.

After leaving J.D., Detective Perez and Mr. Abbey drove back to Wenatchee. They arrived there in the evening and went directly to the D. home. They told Mr. and Mrs. D. they wanted to interview A.D. and M.D. at the police station. Mr. and Mrs. D. said they already had told the girls the police wanted to talk to them, and they had advised them to tell the truth. As the children left the house, their parents again told them to tell the truth. Both Detective Perez and Mr. Abbey testified Mrs. D. turned to them and stated, "You're not bringing them back, are you?"

Detective Perez and Mr. Abbey testified that both A.D. and M.D. defined "secret touch" for them, answered affirmatively when asked if they had a problem with secret touching, and named their parents when asked with whom

they had this problem. Detective Perez described M.D. as tearful when they discussed these matters. Based upon the allegations of A.D. and M.D., the police arrested Mr. and Mrs. D. At trial, M.D. stated Detective Perez had defined "secret touch," and she had told him she did not remember her parents molesting her.

At the time of the above interviews, the two older daughters, E.D. and S.D., were in California with a family friend. Detective Perez and Mr. Abbey went to California to interview them. At first, E.D. denied any parental abuse, then later accused her parents of molesting her. At trial, she recanted those allegations. S.D. consistently denied abuse.

A.D., E.D., and J.D. testified that they felt "pressured" by Detective Perez. Their description of his questioning of them relates conduct that the courts generally regard as improper in the context of an interview of a child. That conduct included telling them the other children had already disclosed abuse by the parents, and identifying the parents as under suspicion instead of asking open-ended questions about abuse. E.D. stated that during her interview, Detective Perez said to her: "I have all today and all night and almost all of tomorrow to sit here and wait until you tell me the truth."

Detective Perez and Mr. Abbey testified they followed proper interview procedures. While both men took notes during these interviews, they destroyed them after they prepared their final reports. They testified they included in the reports everything contained in their notes.

Dr. Mark Shipman examined M.D. on March 7, 1995, at the request of the State. He testified Detective Perez told him M.D. had not disclosed any sexual abuse. M.D. also denied being abused when Dr. Shipman questioned her. Dr. Shipman testified M.D.'s hymen was scarred in a manner consistent with digital penetration.

Beginning in February 1995, M.D. attended weekly counseling sessions with Cindy Andrews, a child sexual abuse therapist. At trial, Ms. Andrews testified about state-

ments M.D. made to her during these sessions. In summary, M.D. at first made general allegations to the effect her parents had touched her where they should not. But, she only recalled the details of those touchings later, after CPS separated M.D. and A.D. by moving M.D. to a different foster home. Ms. Andrews stated the girls were separated after A.D. told Ms. Andrews in counseling that she and M.D. had discussed what would be the quickest way for them to be reunited with their family. Kristen Collier was M.D.'s new foster mother. She denied ever telling M.D. she believed M.D.'s parents had abused her. Her testimony directly contradicted M.D. on this point.

The State charged Mr. and Mrs. D. with multiple sex offenses involving M.D., A.D., E.D., and J.D. At trial, all four children testified. M.D. stated both her mother and father had put their fingers in her "crotch." She remembered this happened at least once, while they were upstairs on the floor of her brother's bedroom. A.D. testified no one had ever touched her in a private spot. She said she had felt pressured by Detective Perez that she had to tell him something happened because he did not believe her when she said otherwise. E.D. testified she had sexual contact with her brother, but no one else. She said she initially denied abuse by her parents, but Detective Perez pressured her to accuse them, stating, "I know it happened, so just tell me." He also told her she could say anything she wanted and he would not tell anybody, and that her sisters had already implicated her parents. J.D. did not recant his accusations against his parents, but admitted he initially denied such abuse occurred. He changed his story after Detective Perez said he knew J.D. was lying because other people already had told him different.

The jury convicted Mr. and Mrs. D. of only the charges involving M.D.— one count of first degree rape of a child and one count of complicity to commit first degree child molestation. This appeal followed.

Additional facts are set forth below, with the issue to which they pertain.

First, Mr. and Mrs. D. assign error to the admission of Ms. Andrews's testimony about statements M.D. made to her in counseling sessions. The trial court relied upon the medical purpose exception to the hearsay rule. ER 803(a)(4). Mr. and Mrs. D. contend the evidence does not satisfy a prerequisite for admission of statements under ER 803(a)(4). Specifically, there was insufficient evidence to support a finding that M.D. understood it was important for medical treatment purposes to give Ms. Andrews accurate information about what had occurred.

ER 803(a)(4) excepts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing . . . the inception or general character of the cause or external source [of symptoms] insofar as reasonably pertinent to diagnosis or treatment." The United States Supreme Court has ruled that admission of child abuse hearsay statements under ER 803(a)(4) does not violate the Confrontation Clause. *White v. Illinois*, 502 U.S. 346, 356, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992). The court held: "[A] statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony." *White*, 502 U.S. at 356.

The advisory committee to the parallel federal rule of evidence notes that "[u]nder the exception the statement need not have been made to a physician." FED. R. EVID. 803(4) advisory committee's note. Therapy for sexual abuse qualifies as medical treatment for purposes of ER 803(a)(4).[1] *In re Dependency of M.P.*, 76 Wn. App. 87, 882 P.2d 1180 (1994), *review denied*, 126 Wn.2d 1012 (1995); *see also State v. Rushton*, 172 Ariz. 454, 837 P.2d 1189, 1192 (1992). Also, some courts have held a child's statements identifying the abuser as a member of his or her

---

[1]For convenience, we use the citation to the Washington rule. The cases we rely upon from other jurisdictions have their own versions of ER 803(a)(4), which are in material part identical to ER 803(a)(4).

family are "reasonably pertinent to . . . treatment." ER 803(a)(4). These courts reason that the abuser's identity is relevant to determining the scope of the child's emotional and psychological injuries and the appropriate treatment. *See State v. Ashcraft*, 71 Wn. App. 444, 456-57, 859 P.2d 60 (1993); *United States v. Tome*, 61 F.3d 1446, 1450 (10th Cir. 1995); *United States v. Renville*, 779 F.2d 430, 437-38 (8th Cir. 1985).

In *Renville*, the court identified two factors critical to the application of ER 803(a)(4): "[F]irst, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." 779 F.2d at 436. These two factors reflect the rationale for the medical purpose exception to the hearsay rule: The declarant has a strong motive to speak truthfully and accurately because his successful treatment depends upon it. *Renville*, 779 F.2d at 436. It is this strong self-interest that makes ER 803(a)(4) a "firmly rooted" hearsay exception. *Ring v. Erickson*, 983 F.2d 818, 820 (8th Cir. 1992) (quoting *Idaho v. Wright*, 497 U.S. 805, 815, 110 S. Ct. 3139, 3146, 111 L. Ed. 2d 638 (1990)). As such, it comes with its own " ' "particularized guarantees of trustworthiness." ' " *Ring*, 983 F.2d at 820 (quoting *Wright*, 497 U.S. at 816). Statements that satisfy its criteria need no other " ' "indicia of reliability" ' " for the court to admit them into evidence. *Ring*, 983 F.2d at 820 (quoting *Wright*, 497 U.S. at 815).

Here, the State filed a pretrial motion in limine to admit M.D.'s statements to Ms. Andrews under ER 803(a)(4). The prosecutor represented to the court that Ms. Andrews would testify that she tells children in the first counseling session that she is a therapist, and she explains what a therapist does. Further, the State represented that M.D. would testify she knew Ms. Andrews was her therapist. Over objection by the defense, the court ruled the statements admissible. The court noted it had observed M.D. during the pretrial hearings and was impressed with her

intelligence. It appears the trial court regarded M.D. as mature enough to realize the importance of giving accurate information to her counselor.

At trial, Ms. Andrews testified as the prosecutor had indicated she would. After Ms. Andrews told the jury what M.D. said to her during the counseling sessions, the State called M.D. as a witness. M.D. testified she knew Ms. Andrews was her therapist. However, she also testified she did not know what Ms. Andrews was supposed to do.

■ Mr. and Mrs. D. argue the above record is insufficient to establish the basic trustworthiness of M.D.'s statements, as supported by her self-interest in receiving correct medical treatment. We agree that in the case of a child who has *not* sought medical treatment, but makes statements to a counselor procured for him or her by a state social agency, the State's burden under ER 803 is more onerous. The record must *affirmatively demonstrate* the child made the statements understanding that they would further the diagnosis and possible treatment of the child's condition. *See State v. Wade*, 136 N.H. 750, 622 A.2d 832 (1993); *R.S. v. Knighton*, 125 N.J. 79, 96, 592 A.2d 1157, 1166 (1991); *Renville*, 779 F.2d 430. Cases from other jurisdictions that apply the same standard to such a declarant as is applied in situations involving adults ignore the underpinning of the rule. *See, e.g., United States v. Joe*, 8 F.3d 1488 (10th Cir. 1993), *cert. denied*, 510 U.S. 1184 (1994), cited by the dissent.

In *Wade*, the court refused to assume, "absent a record affirmatively establishing the proposition, that a young child possessed a sufficient treatment motive to allow her out-of-court statements to a physician to be introduced at trial." 136 N.H. at 835. The court held at page 835 "the proponent of [the] statements must present evidence . . . showing that the child made the statements understanding they would further the diagnosis and possible treatment of the child's condition." It deemed the State's evidence insufficient in this regard. The doctor testified only about the importance of obtaining an accurate patient history, but

did not indicate the child understood the need to provide truthful information. *Wade*, 136 N.H. at 836.

*Knighton* adhered to a similar evidentiary standard. There, the court stated that an adequate foundation should include evidence that a parent or the doctor "explained to the [child] the reason for the [visit] or the need to be truthful when speaking with the doctors." *Knighton*, 592 A.2d at 1166. In *Renville*, the court relied on evidence that the physician made clear to the child his questions "were necessary to obtain information to treat her and help her overcome any physical and emotional problems which may have been caused by the recurrent abuse." *Renville*, 779 F.2d at 438-39. *Compare Cassidy v. State*, 74 Md. App. 1, 536 A.2d 666, 680 (1988) (statement by two-year-old that "Daddy did this" not admissible under ER 803(a)(4) because she admittedly did not understand the need to speak truthfully and accurately) *and State v. Harris*, 247 Mont. 405, 808 P.2d 453, 457 (1991) (statement by three-year-old to his counselor identifying his baby-sitter and the baby-sitter's husband as his assailants was not admissible under ER 803(a)(4) because the court was not "assured" the child understood the need to tell the truth).

In this case, Ms. Andrews testified only that her standard practice is to tell children who she is and what she does. She did *not* testify that she explained to M.D. her successful treatment depended upon her providing truthful and accurate information about what had happened to her. Absent such testimony, we will not assume that this nine-year-old was motivated to tell the truth by her self-interest in obtaining proper medical treatment.

We also take note of the fact Division One has required an additional showing of reliability for admission of statements of children too young to understand the need for accurate responses to a doctor or therapist's questions. *State v. Florczak*, 76 Wn. App. 55, 882 P.2d 199 (1994), *review denied*, 126 Wn.2d 1010 (1995). That approach is not relevant here because M.D., who was nine years old at the time she made the statements to Ms. Andrews, was capable of

the requisite state of mind. However, in cases where a showing of reliability is needed, we believe the preferable approach is to conduct a child sexual abuse hearsay hearing pursuant to RCW 9A.44.120. The procedure provided for in that statute has been upheld against Confrontation Clause challenges. *State v. Swan*, 114 Wn.2d 613, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991). *See also* Reserved ER 807 cmt. ("[H]earsay statements made by a child victim . . . were the subject of a recent addition to the Uniform Rules of Evidence. In Washington, these statements are governed by RCW 9A.44.120 . . . ." Accordingly, the Washington rulemakers found no reason to adopt Uniform Rule 807 in this state).

■ The remaining question is whether the error in admitting M.D.'s hearsay testimony without proper foundation was prejudicial or harmless. M.D.'s direct testimony at trial was not as detailed as her hearsay statements. Additionally, the defense's cross-examination of M.D. raised serious questions about the reliability of her testimony. In these circumstances, Ms. Andrews's hearsay testimony assumed greater importance. We therefore hold a reasonable probability exists the erroneous admission of these hearsay statements affected the outcome of the trial. *State v. Ray*, 116 Wn.2d 531, 546, 806 P.2d 1220 (1991). The convictions are reversed and the cause is remanded for retrial.

Second, Mr. and Mrs. D. contend the trial court erred when it denied them funds to procure an expert on false memory syndrome.[2] They believe inconsistencies in M.D.'s statements and trial testimony were the result of the State's allegedly improper interview techniques. According to them, the testimony of an expert on false memory syndrome would help the jury to understand why a child may falsely accuse another of abuse.

Before trial, the attorneys for Mr. and Mrs. D. moved for the appointment of an expert to testify about false memory syndrome. The syndrome allegedly explains how improper

---

[2]We address this issue and others because they may arise in the retrial.

questioning can cause a child to honestly believe she has been molested when, in fact, she has not. According to the defense, it was only on the eve of trial that M.D. remembered her parents molesting her. Before that, she denied such abuse, told the people that questioned her she did not remember her parents touching her, or she did not recall any specific details of touches by her parents. The State relied upon Detective Perez's testimony that M.D. told him in the initial interview that her parents had touched her inappropriately. The court denied the motion, holding "[t]here [is] simply an insufficient showing of the necessity of this expert testimony in this case and the admissibility thereof."

■ ■ Under CrR 3.1(f)(1) and (2), the court shall authorize expert services in addition to counsel if it finds the services are necessary to an adequate defense and the defendant is not financially able to obtain them. The trial court's determination as to whether the services are necessary is within its informed discretion. *State v. Hoffman*, 116 Wn.2d 51, 90, 804 P.2d 577 (1991). Even if an appellate court holds the trial court abused its discretion when it denied services, it will not reverse the defendant's conviction absent a showing of substantial prejudice. *State v. Mines*, 35 Wn. App. 932, 935, 671 P.2d 273 (1983), *review denied*, 101 Wn.2d 1010 (1984).

Here, there is evidence M.D. stated from the beginning her parents had abused her, although her allegations became more detailed after she was removed from the foster home she shared with A.D. On the other hand, there is evidence she denied the abuse when questioned by Dr. Shipman. Moreover, Dr. Shipman testified Detective Perez had told him before he examined M.D. that she had denied parental abuse. M.D. also told defense counsel in pretrial interviews that she could not remember any abuse. But at trial M.D. testified her statements she could not remember were not true. She said she told people that because she was afraid "we wouldn't be a family again."

To the extent M.D.'s statements about the abuse simply

became more detailed, they are not contradictory. But, her denial of any abuse when asked by Dr. Shipman, and her assertions she did not remember, then, later, remembered, after she changed foster homes, raises questions about the reliability of her memory. Expert testimony on why a child may make untruthful, inculpatory statements went to the crux of the D.s' defense.

We therefore hold the trial court abused its discretion when it denied Mr. and Mrs. D. the funds to secure expert testimony on false memory syndrome. On retrial, the superior court shall authorize appointment of such an expert.

██ Third, Mr. and Mrs. D. assert the State denied them their right to compulsory process by pressuring their children to falsely accuse them of sexual abuse. A criminal defendant has the right to compulsory process. *See* Sixth Amendment to the U.S. Constitution; Wash. Const. art. I, § 22 (amend. 10). But without assurances the State will not unduly influence the minds of witnesses, the right is meaningless. *State v. Kearney*, 11 Wn. App. 394, 396, 523 P.2d 443, *review denied*, 84 Wn.2d 1011 (1974). Hence, the court in *Kearney* dismissed charges against a defendant because the prosecutor had advised witnesses the defendant refused to take a polygraph. And, in *State v. McDonald*, 40 Wn. App. 743, 700 P.2d 327 (1985), the court remanded for a hearing on whether the eyewitness's identification of the defendant was impermissibly tainted by comments of a detective at a lineup.

As evidence of the State's improper influence, Mr. and Mrs. D. cite inconsistencies in M.D.'s statements and improper interview techniques used by the State.

Inconsistent Statements Made by M.D.

M.D. alternately denied abuse, stated she could not remember abuse, or accused her parents of abuse. At trial, she stated she told the prosecutor in her first meeting with him that her parents had *not* molested her. Dr. Shipman

testified M.D. denied parental abuse when he examined her on March 7. On March 17, M.D. told defense attorneys she could not remember any abuse. At a pretrial hearing, she also stated she could not remember telling Detective Perez her parents touched her inappropriately. And, she agreed that if she had said that, it was not the truth, because she could not remember if that happened. Both Detective Perez and Mr. Abbey testified M.D. made allegations against her parents in their initial interview with her. Ms. Andrews testified that on March 18, the day following her interview with the defense attorneys, M.D. said her parents had put their fingers in her private parts, and that the vagina hurt "more."

Improper Interview Techniques.

At trial, M.D. testified she did not know what a "secret touch" was until Detective Perez told her. M.D. also testified that social worker Pat Boggess helped her remember "about things." She had almost daily contact with her. Ms. Boggess herself admitted to over 30 meetings with M.D. beginning December 29, 1994, and continuing through the trial, which took place in late April 1995. M.D. further testified Ms. Boggess, Ms. Andrews, and the prosecutor told her they thought her parents had touched her improperly. Finally, M.D. said her new foster mother and Ms. Boggess informed her that if she said her parents touched her, they would get help, and she could go home.

Mr. and Mrs. D. argue the evidence set forth above, along with the testimony of the other children about Detective Perez's interview techniques, mandates a hearing on the issue of improper influence. They rely upon an opinion by the New Jersey Superior Court, Appellate Division, that reversed a defendant's conviction and remanded for a hearing on the issue of whether the State's questioning of the children was so suggestive and coercive that they were rendered incompetent to testify. *State v. Michaels*, 264 N.J. Super. 579, 625 A.2d 489, 517 (1993), *aff'd*, 136 N.J. 299, 642 A.2d 1372 (1994). The court detailed improprieties, some of which Mr. and Mrs. D. allege occurred here:

Certain questions planted sexual information in the children's minds . . . Children were encouraged to help the police "bust [] this case wide open." Peer pressure and even threats of disclosing to the other children that the child being questioned was uncooperative were used. A child was told that she needed to talk to help her friends and that the investigator had already spoken to five other children who revealed what happened. In some cases, certain children were told in detail what another child had disclosed. Sexualized discourse was encouraged and applauded.

. . . Children were told they could keep Kelly locked in jail by cooperating; therefore, they and their families would be safe. Anatomical dolls were used in the interviews, and in some cases the children did not disclose anything until they were either presented with the dolls, shown various eating utensils, or encouraged to demonstrate how Kelly *might* have hurt a little girl or boy. The records of the interviews show that these methods caused certain children to use their imagination and stray from reality, even to the dismay of the investigator at times. In several instances, the children were tired and/or resistant to participating in the interviews, but the investigators continued to press for cooperation.

*Michaels*, 625 A.2d at 511.

We agree the facts cited by Mr. and Mrs. D. indicate possible misconduct by the State that may have infringed on their right to compulsory process. On retrial, the superior court shall conduct a hearing and enter findings on the issue of whether the State improperly influenced statements and testimony by M.D.

Fourth, Mr. and Mrs. D. contend their rights to due process were violated by Detective Perez's and CPS investigator Timothy Abbey's destruction of the notes they took during the initial interview of M.D. They point out that a key issue in their trial was the reliability of the children's statements to Detective Perez and Mr. Abbey. They believe the phrasing of Detective Perez's questions and the exact responses given by M.D. were critical to determining whether her accusations were elicited by Detective Perez's manner or whether they were based upon fact.

Both Detective Perez and Mr. Abbey testified they discarded the notes they took during their initial interview of M.D., after they prepared their formal written reports of the interview. Detective Perez also testified there was nothing in his notes that he did not include in his formal report. Mr. Abbey testified his notes did not document specific questions asked and answers given. In his opinion, the interview satisfied statutory and agency standards, even though CPS rules state that "Verbatim documentation of questions/answers regarding specific abuse questioning is desirable."

The defense offered the testimony of John Beuhler, a Wenatchee attorney, on the issue of whether Detective Perez acted in bad faith. Mr. Beuhler stated that on March 17, 1995, while he was acting as a defense attorney in a child molestation prosecution, Detective Perez told him in the courthouse hallway that "[y]ou know good and well why I get rid of my reports. You burned me eight years ago in a case, and I've got rid of them ever since." Mr. Beuhler admitted the exchange was lighthearted, but he stated the exchange was "based in truth," and he did not believe Detective Perez was joking. Detective Perez denied making the statement.

█ Dismissal of criminal charges is the remedy for the State's destruction of evidence only if (1) the State fails to preserve *material exculpatory* evidence or, (2) in the exercise of bad faith, it fails to preserve *potentially useful* evidence. *State v. Wittenbarger*, 124 Wn.2d 467, 475-77, 880 P.2d 517 (1994). Here, it does not appear the discarded notes were either *material and exculpatory* or *potentially useful*. Both Detective Perez and Mr. Abbey stated their notes were not verbatim; they did not contain the specific questions they asked M.D. Without a verbatim report, it is unlikely Mr. and Mrs. D. could use the notes to establish improper and overbearing interview techniques. Both men also testified their reports included everything in their notes. The fact CPS rules state the "desirability" of a verbatim record, does not automatically lead to the conclu-

sion the notes' destruction was done in bad faith. Even if Mr. Beuhler's testimony is considered sufficient to establish Detective Perez's bad faith, the court could conclude the evidence of the notes' content did not support a finding they were potentially useful evidence.

Mrs. D. also raises several issues pro se. First, she contends the State violated her due process rights when it failed to make a verbatim record of the interviews with her children. But she has not cited to any statute that requires verbatim records of child abuse victim interviews, or any case that holds such records are necessary as a matter of due process. Exhibit 5, the procedure manual used by the State child welfare agencies, only provides verbatim reports are "desirable," not mandatory.

█ Second, Mrs. D. asserts the court erred when it ruled defense counsel could not cross-examine the State's witnesses about information contained in reports prepared for the children's dependency hearings. "The scope of cross examination lies in the discretion of the trial court and will not be disturbed unless there is a manifest abuse of discretion." *State v. Campbell*, 103 Wn.2d 1, 20, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985). Nevertheless, in exercising discretion, the court may not prejudice a defendant's constitutional right to confront the witnesses against him. *Cf. State v. Dickenson*, 48 Wn. App. 457, 740 P.2d 312, *review denied*, 109 Wn.2d 1001 (1987) (court's refusal to permit impeachment by prior inconsistent statement deprived defendant of right to confront the witness, where witness testified defendant killed victim).

As an example of the trial court's error, Mrs. D. cites evidence in the dependency hearing that Ms. Boggess regarded her initial meeting with E.D. as inconclusive as to the existence of abuse. At trial, Ms. Boggess testified her initial meeting with E.D. was not an interview. The two statements are not contradictory. Therefore, cross-examination using the dependency hearing evidence would have had limited usefulness. There was no error.

█ Third, Mrs. D. maintains the court's refusal to

permit Nelson Gwynn to testify J.D. had a poor reputation for truthfulness, was error. Mr. Gwynn knew J.D. through Boy Scouts. With respect to reputation evidence, our Washington State Supreme Court has held that " 'there should be no restriction necessarily limited to the community in which the witness sought to be impeached lives . . . .' " *State v. Land*, 121 Wn.2d 494, 498, 851 P.2d 678 (1993) (quoting *United States v. Mandel*, 591 F.2d 1347, 1370, *overruled in part on other grounds on reh'g*, 602 F.2d 653 (4th Cir. 1979), *cert. denied*, 445 U.S. 961 (1980)). Rather, the court recognized that "the realities of our modern, mobile, impersonal society" mean that a witness may have a reputation for truth and veracity in other "communit[ies]," such as the workplace. *Land*, 121 Wn.2d at 498 (quoting *Mandel*, 591 F.2d at 1370).

Here, the trial court excluded Mr. Gwynn's testimony on the basis the "community" "has to be large enough that it means something other than just personal opinion." The court relied on *State v. Swenson*, 62 Wn.2d 259, 382 P.2d 614 (1963), *overruled by Land*, 121 Wn.2d 494, which held that the defendant's church was not a large enough community for this purpose. *Land* specifically overruled *Swenson*. *Land*, 121 Wn.2d at 498. *Land* also supports admission of Mr. Gwynn's testimony about J.D.'s reputation for truthfulness. On retrial, the court should permit Mr. Gwynn to testify on this issue.[3]

Fourth, Mrs. D. contends the State violated her right to due process by giving State witnesses unlimited access to the children. Witnesses do not "belong" to either party; hence, it is improper for counsel to suggest to a witness that he or she refuse to be interviewed by opposing counsel. *State v. Hofstetter*, 75 Wn. App. 390, 395-96, 878 P.2d 474, *review denied*, 125 Wn.2d 1012 (1994). Mrs. D. does not contend the prosecutor prevented defense counsel from interviewing the children or denied defense experts

---

[3]The trial court's decision to exclude that testimony is not a basis, by itself, to reverse Mrs. D.'s conviction. There was other evidence indicating J.D. had lied in making his allegations.

access to them. Her sole contention is that some of the State's witnesses, such as Ms. Andrews and Ms. Boggess, met with the children on a weekly or sometimes daily basis, while she had no contact with them. That fact does not translate into a denial of due process.

Fifth, Mrs. D. complains her right to due process was interfered with by Ms. Boggess, who sat next to M.D. when she testified. Mrs. D. does not quarrel with child victims' rights to have a friend sit beside them when they testify. But she refers to the point in the record in which M.D. testified Ms. Boggess had told her if she said her parents touched her, she could go home. Following a side bar conference, M.D. changed that to if she told the truth, she could go home. According to Mrs. D., when counsel asked her if Ms. Boggess had told her to change her testimony, M.D. said she had not. Consequently, Mrs. D. has not shown any overreaching on Ms. Boggess's part, at least in the role she played during M.D.'s testimony.

Finally, Mrs. D. asserts the medical evidence of abuse, as testified to by Dr. Shipman, was inaccurate. She cites studies that show young girls' hymens often exhibit scarring when no abuse has occurred. The studies Mrs. D. cites were not offered at trial. It appears they go to the weight, rather than the admissibility of Dr. Shipman's testimony. There was no error.

The remaining issues raised by Mrs. D. pro se also were raised by appellate counsel. We have addressed those issues earlier in this opinion.[4]

Reversed and remanded.

KURTZ, J., concurs.

BROWN, J. (dissenting) — I respectfully dissent to the majority's holdings reversing the trial court on the ER

---

[4]The State has moved to strike portions of Mrs. D.'s pro se brief. The motion is granted in part. The brief's references to social research, writings and theories not presented to the trial court are stricken.

803(a)(4) issue. I also would hold the superior court's denial of Mr. and Mrs. D.'s request for funds to have a false memory expert was harmless error, and that the issue of whether the State improperly influenced witnesses was not preserved for review. I concur with the majority holdings rejecting the due process challenge to the destruction of the interviewers' notes and likewise fail to find merit in the pro se contentions. Finally, I would affirm a peremptory challenge issue not addressed by the majority.

## ANALYSIS

1. <u>Application of ER 803(a)(4).</u> Cindy Andrews testified that she counseled M.D. on a regular basis, beginning on February 9, 1995. She stated that her custom in the initial interview is to inform her clients who are children that she is a counselor, and she explains what a counselor does. The record shows Ms. Andrews and M.D. participated in an initial interview and thereafter continued an ongoing therapeutic relationship. M.D. further testified Ms. Andrews was her therapist. These are objective, uncontested facts.

The majority decision turns on an isolated question and answer during the State's direct examination of M.D. during the trial and *following* the trial court's earlier determination pursuant to ER 104 that her statements to the therapist were admissible under ER 803(a)(4). During M.D.'s direct testimony in the State's case, the prosecutor asked what Ms. Andrews did. M.D. simply responded "I don't know." There was no further direct or cross-examination to clarify what M.D. understood the question pertained to and, more importantly, there was no objection raised at this point. M.D. certainly understood that Ms. Andrews was her therapist in view of her earlier testimony during the trial. Whether M.D. understood how Ms. Andrews performs her functions as a therapist is irrelevant to the admissibility of the evidence. Even if this testimony did conflict with M.D.'s earlier testimony, and even if the defense had pointed out to the court the specific objection

raised here, the testimony would merely be just part of the range of testimony on the subject. Therefore, the trial court would have been well within its discretion to admit it.

The therapeutic relationship is unmistakably established by the testimony of the therapist and by M.D.'s testimony. This is not a case where M.D. lacks the capacity to testify, nor is it a case of claimed incompetence. There is no challenge to her ability to know, recollect or communicate, nor is there a challenge to the trial court's determination that she is a bright and intelligent nine-year-old child. This is not a confrontation problem, as M.D. testified by appearing at the trial and describing the acts of claimed sexual contact alleged in the hearsay. *State v. Rohrich*, 132 Wn.2d 472, 481, 939 P.2d 697 (1997). This is not a case where there is a claim of failed unavailability under RCW 9A.44.120. To elevate the single question and response above all other inferences to be drawn from this record is error. We do not sit as fact finders in the place of the trial judge. We cannot ignore the function of the trial court as a preliminary fact finder under ER 104.

Moreover, the critical time for judging the admissibility of a hearsay statement is at the time the statement is made by the declarant, not later. For example, an excited utterance depends upon whether the declarant is excited at the time the statement is made, not later at trial when the declarant may not remember what took place or, for some self-serving reason, deny his or her excitement at the time of the declaration A trial court is not prevented from considering other objective and relevant testimony from bystanders on the same subject and making its determination under ER 104. If at trial the statement or circumstances are denied or contradicted by a declarant, then such evidence may certainly be admissible for determining the credibility or weight to be given the evidence, but it does not prevent the trial court from admitting the hearsay in the first instance. Nor does the later testimony prevent a fact finder from considering all the evidence bearing on the question, no matter who offers it. I believe the

majority's holding today in effect, elevates this isolated portion of the testimony to a form of evidentiary trump card. I believe witnesses should not be permitted to hold this kind of power over the truth-telling process.

A declarant's self-interest in receiving effective medical diagnosis or treatment "carries special guarantees of credibility that [a] trier of fact may not think replicated by courtroom testimony." *White v. Illinois*, 502 U.S. 346, 356, 112 S. Ct. 736, 743, 116 L. Ed. 2d 848 (1992). The circumstances of the declaration provide the independent indicia of reliability needed to satisfy Confrontation Clause concerns. *White*, 502 U.S. at 356. The rule's criteria are objective: Was the statement "made for purposes of medical diagnosis or treatment"? And, was it "reasonably pertinent to diagnosis or treatment"? *United States v. George*, 960 F.2d 97, 100 (9th Cir. 1992). Inquiries into the declarant's motive are "not contemplated by the rule; the rule itself has built in guarantees that assure the trustworthiness of [the] statement." *United States v. Joe*, 8 F.3d 1488, 1494 n.5 (10th Cir. 1993), *cert. denied*, 510 U.S. 1184 (1994). Requiring the trial court to determine the declarant's subjective motivation needlessly complicates the rule's application without reaping a corresponding benefit. As previously noted, it also opens the possibility some declarants, if they are parties to the court action, will disclaim the necessary motivation if it furthers their position at trial.

In reaching its conclusion, the majority relies on cases from other jurisdictions, many of which involved children considerably younger than M.D. Here, M.D. was nine years old. We also have the help of the trial court's observation that she appeared intelligent and mature. I see no reason to treat M.D. differently from other declarants.

Additionally, Mr. and Mrs. D.'s objection did not preserve the issue they now raise for appellate review. To preserve an issue for review, a party must specify the particular ground upon which the objection is made. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied*, 475

U.S. 1020 (1986). Here, Mr. and Mrs. D. did not specifically argue to the trial court that application of ER 803(a)(4) was improper because M.D. did not understand the treatment purpose of her visits with Ms. Andrews. They simply argued M.D. did not make her statements for the purpose of medical diagnosis or treatment.

2. Denial of funds for additional false memory expert. I agree it was important for Mr. and Mrs. D. to present testimony of a false memory expert and the trial court should have granted the defense request for funds to provide testimony on this theory of the case. It was important to explain why a child may make untruthful statements. When the court first considered a request for funds to obtain a false memory expert, the request should have been granted, and the failure to do so was error.

However, I am convinced any error in denying Mr. and Mrs. D. funds for an expert was harmless. The testimony of Dr. Gerald McCarty, who the court appointed as a defense expert on the subject of recantation of abuse allegations by children, addressed the issue of false memory. Dr. McCarty testified about circumstances that could engender recall in a child different than what actually occurred.

Mr. and Mrs. D. have not explained what an expert on false memory syndrome could add to Dr. McCarty's testimony. I therefore conclude the denial of funds for such an expert was not reversible error.

3. Improper influence. I agree the facts cited by Mr. and Mrs. D. indicate possible misconduct. However, they did not request a hearing at the trial court. Ordinarily, appellate review is limited to issues the appellant raised in the trial court. A claim of *manifest* error affecting a constitutional right is an exception to that rule. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); RAP 2.5(a)(3). An error is manifest if the defendant "show[s] how, in the context of the trial, the alleged error actually affected [his] rights; it is this showing of actual prejudice that makes the error 'manifest.' " *McFarland*, 127 Wn.2d at 333. To demonstrate actual prejudice stemming from

counsel's failure to move for or object to the admission of evidence, a defendant "must show the trial court likely would have granted the motion if made [or sustained the objection]." *McFarland*, 127 Wn.2d at 333-34.

The claimed error here is not manifest. The defense explored facts of the alleged misconduct in its cross-examination of the State's witnesses, but those witnesses denied the allegations. A hearing and the entry of findings would have resolved these disputes. Even though I agree a better record would improve review of this question, it is improper to address Mr. and Mrs. D.'s contentions based on this record.

4. Peremptory challenge. The majority is silent on a peremptory challenge question. Because they reverse, I presume it is their view that it is not necessary to reach this issue. Because I differ in the outcome, I believe it is necessary for this issue to be reached in the event of further review.

The issue is whether the trial court erred in permitting the State to exercise a peremptory challenge to a juror already passed. Mr. and Mrs. D. made the following objection with regard to the State's peremptory challenge of juror number 34:

> Mr. Howard: Your Honor, yesterday during jury selection Mr. Fore had initiated a pass when we were doing preemptory [sic] challenges. He passed to Juror No. 34. He then apparently did not know where the pass line was or the strike zone was, and the Court allowed him to go back and preempted [sic] a juror that he had passed on previously.

> The Court: Okay. And the reason I allowed it was because of all the cause strikes we had, I had a hard time figuring out where the strike line was. In fact, counsel came up, and I had it in the wrong place at that time, too. So it was confusing, given all the jurors that we had stricken for cause as well as preempts [sic] by then; so I gave the benefit of the doubt to Mr. Fore that he was simply confused.

CrR 6.4(e)(2) sets forth the procedure for the parties'

exercise of peremptory challenges. It provides: "[P]eremptory challenges shall be exercised alternately . . . until the peremptory challenges are exhausted or the jury accepted." Here, the rule was not strictly complied with because the court permitted the prosecutor to back up and exercise a peremptory challenge to juror 34. The court based its ruling on the fact the number of cause strikes had created confusion over where on the jury panel the strike line ended.

The burden of showing prejudice or a lack thereof flowing from an error in the jury selection process depends upon whether the departure from procedure is material. If the parties have complied with the substance of the jury selection procedures, the defendant has the burden of proving the lack of strict compliance prejudiced him or her. *State v. Tingdale*, 117 Wn.2d 595, 600, 817 P.2d 850 (1991). The breach of procedure in Mr. and Mrs. D.'s case was not substantial. It in no way compares to the procedural breaches that occurred in the cases they rely upon. *Compare State v. Rice*, 120 Wn.2d 549, 562, 844 P.2d 416 (1993) (no gross departure from guidelines when excusing jurors) *with Tingdale*, 117 Wn.2d at 601 (selection process allowed court to assemble a panel of its own choosing). There was no error.

## CONCLUSION

For the reasons stated, I would affirm Mr. and Mrs. D.'s convictions.

Reconsideration denied January 27, 1998.

Petition for review granted and case remanded to the Court of Appeals at 136 Wn.2d 1019 (1998).