# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70807-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES WILLIAM SCHUMACHER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 9, 2015 |
| | ) | |

VERELLEN, A.C.J. — James Schumacher appeals from a second degree murder conviction for the murder of his wife, Jean.[1] He contends that the trial court erred by admitting evidence of Jean's state of mind, his past abuse of Jean, general marital discord, and statements Jean made to medical providers about past abuse. Because Schumacher put at issue the tumultuous nature of the marital relationship, evidence that Jean feared him was relevant and properly admitted. And because the other challenged evidence was properly admitted as evidence of Schumacher's intent and motive, we affirm the conviction.

Schumacher further challenges his exceptional sentence, contending that the sentencing aggravator of an ongoing pattern of psychological abuse is unconstitutionally vague and that the evidence was insufficient to support a finding of

---

[1] To avoid confusion, we refer to Schumacher's wife by first name.

that aggravator. Because the void for vagueness doctrine does not apply to a sentencing aggravator, and the record supports the jury's finding that there was an ongoing pattern of physical or psychological abuse, we affirm the exceptional sentence.

## FACTS

On March 23, 2012, James Schumacher walked into the Bellevue Police Department headquarters and confessed to murdering his wife of 46 years, Jean. He told the first officer he met that he and Jean had been arguing for over 15 years and that a few days earlier, during an argument, she approached him with a hammer and threatened to divorce him. She did not strike him with the hammer, but put it away and went to bed, telling him she did not want to be bothered. She went to her separate bedroom and locked the door.

Schumacher stayed up all night "seething" about the incident.[2] The next morning, he got up and retrieved a hatchet from the garage. He picked the lock on Jean's bedroom door and while she was still sleeping, struck her in the face with the hatchet five to six times, killing her.

He hid the body under the bed. He put the hatchet back in the garage, packed up some belongings and considered fleeing. He went to the bank, withdrew money, and took the family dog to an animal shelter to be boarded for an extended period. He then reconsidered leaving town and contemplated killing himself, but ultimately decided to turn himself in.

---

[2] Report of Proceedings (RP) (May 21, 2013) at 37.

After Schumacher confessed, the officer asked him if he felt okay, and Schumacher responded that he felt "a weight had been lifted."[3] He proceeded to give a full videotaped confession, detailing how he murdered his wife and that he did so because he was tired of her constant nagging. He stated that he decided that morning that "he just [couldn't] take it anymore" and hit her with the hatchet five or six times "to make sure that it was done . . . [t]hat she was dead."[4]

Police found the body hidden under the bed, as he had indicated. The medical examiner confirmed that Jean had suffered at least five chopping wounds to her head and found no defensive wounds on her body.

The State charged Schumacher with first degree murder with a deadly weapon sentencing enhancement. The State also alleged as a sentencing aggravator that the crime was a domestic violence offense that was part of an ongoing pattern of psychological, physical, or sexual abuse of the victim.

At trial, Schumacher asserted a defense of diminished capacity. He offered the expert testimony of Dr. Craig Beaver, who opined that Schumacher has early stage dementia and that his unmanaged diabetes, depression, poor nutrition, and illness contributed to his diminished mental state. He further testified that the stress of Schumacher's tumultuous marriage contributed to his mental impairment. Dr. Beaver concluded that, as a result of this impairment, Schumacher was unable to intend or premeditate the murder. The State offered expert testimony from Dr. Brian Judd, who testified that even if Schumacher had mild dementia, neither this condition

---

[3] Id. at 46.

[4] Ex. 241 at 19, 24.

3

nor his other health ailments rendered him incapable of forming premeditated intent at the time of the murder.

Over defense objection, the State also offered evidence of prior marital discord between Schumacher and Jean, including a domestic violence incident in November 2010 that resulted in Schumacher's conviction for fourth degree assault. The State also offered statements Jean made to her daughter that she feared Schumacher would kill her when he was released from jail following the November 2010 incident and statements that Jean made to medical providers in 2010 about past abuse. The court ruled that all of this evidence was admissible and probative of motive and intent.

A jury found Schumacher guilty of the lesser included offense of second degree murder and also found that the State proved the sentencing enhancement and the sentencing aggravator. The court imposed an exceptional sentence of 300 months based on the sentencing aggravator. The standard range was 147 to 244 months. Schumacher appeals.

## DISCUSSION

### Evidence of the Victim's State of Mind

Schumacher contends that the trial court erred by admitting Jean's statement that she feared he would kill her upon his release from jail in November 2010 because her state of mind was not at issue in the case. We disagree.

Over defense objection, the trial court admitted evidence of Jean's statements to her daughter, Susan Schumacher (Susan), made after Schumacher had been arrested in November 2010 on a domestic violence charge. The court permitted

Susan to testify that after Jean learned Schumacher was going to be released from jail following the November 2010 incident, Jean "started screaming and crying" and said, "He is going to kill me. Oh my God, what am I going to do?"[5] The court ruled:

> [W]ith respect to the statements made on hearing [of] his release from jail, and certainly, the State will have to lay a foundation for an excited utterance, but it appears to meet all the criteria for an excited utterance. I can't imagine what could be a more startling event than knowing someone that you fear, that assaulted you in the past, is now going to be released and will have access to you again. . . . And again, because there is no question of identity and whether, in fact, the killing—whether in fact, he actually killed her, while a limiting instruction may be appropriate, it's not—we could certainly offer, if someone wants to prepare a limiting instruction, we can certainly indicate, I suppose, that they are not to consider it for the fact of whether her opinion was accurate that in fact he was going to kill her, although I'm not sure how that would benefit the defense or State of the factual circumstances, I'm not sure that that's necessary. But rather, it is to show the depth of the dysfunctionality of their relationship; that she would think not only that he would be angry, but that she was so fearful that she would have an opinion, rightly or wrongly, and wrongly as it turned out, because of course, he did not kill her upon being released from jail, that he was going to kill her as a result of being arrested. For that reason, the Court finds that it's not unfairly prejudicial and is more probative than unfairly prejudicial and will allow it.[6]

ER 803(a)(3) provides an exception to the hearsay rule for statements "of the declarant's then existing state of mind."[7] But the declarant's state of mind must still be "relevant to a material issue in the case."[8] Thus, "[i]n a homicide case, if there is no defense which brings into issue the state of mind of the deceased, evidence of

---

[5] RP (May 29, 2013) at 54-55.

[6] RP (May 16, 2013) at 118-19.

[7] As the trial court also found, Jean's hearsay statements fall within the excited utterance exception to the hearsay rule.

[8] State v. Johnson, 61 Wn. App. 539, 545, 811 P.2d 687 (1991).

fears or other emotions is ordinarily not relevant."[9] But in cases where the defendant asserts accident or self-defense, admission of evidence of the victim's fears is relevant to whether the victim would have been likely to act as the defendant claimed.[10]

In State v. Athan, the court held it was not an abuse of discretion to admit a murder victim's statements under ER 803(a)(3) as evidence of state of mind because the defendant put the victim's state of mind at issue.[11] There, the State alleged the defendant sexually assaulted the victim before murdering her, but at trial, the defendant's theory was that he had had consensual sex with her and that she was murdered by someone else.[12] The trial court admitted statements the victim made to her friends that she had no romantic interest in the defendant and that he gave her "the creeps."[13] On appeal, the court rejected the defendant's argument that the victim's state of mind was irrelevant because he did not raise a claim of accident or self-defense. Rather, the court concluded that, by suggesting that he had a romantic relationship with the victim, her statements about her feelings toward him became relevant.[14]

Likewise here, Schumacher put at issue the nature of his relationship with Jean. He claimed that the tumultuous nature of the relationship contributed to his

---

[9] State v. Parr, 93 Wn.2d 95, 103, 606 P.2d 263 (1980).

[10] Id.

[11] 160 Wn.2d 354, 383, 158 P.3d 27 (2007).

[12] Id. at 381-82.

[13] Id. at 381.

[14] Id. at 383.

impaired mental state and offered expert testimony from Dr. Beaver that the stress of the relationship affected his ability to form intent. Thus, as in Athan, Jean's perspective of the relationship, which included her fears of him, became relevant. Indeed, Dr. Beaver agreed that an understanding of the nature of the marital relationship was helpful to determining whether he had the ability to form the requisite intent to commit the murder.

Dr. Beaver testified that Schumacher told him that he was very unhappy in his marriage, that Jean had a separate bedroom with a lock on the door, and that Jean always criticized him. Dr. Beaver further testified that "there was a lot of stress and tension between he and his wife, some indication that he felt threatened,"[15] and that Schumacher said that there were threats to kill made by both of them. He also testified that Schumacher described an incident where Jean came into his room and waived a hammer at him because she was upset with him for not getting out of bed and taking care of chores around the house. Dr. Beaver opined that the increasing conflict was a factor that contributed to Schumacher's stress and impacted his cognitive ability to form the requisite intent. Thus, evidence that Jean in fact feared him was relevant to address these claims and present the complete picture of the relationship that he claimed contributed to his diminished mental state. The trial court did not abuse its discretion by admitting the statements.

Schumacher's reliance on State v. Cameron is misplaced.[16] In Cameron, the court held it was reversible error to admit evidence that the murder victim expressed

---

[15] RP (May 22, 2013) at 70.
[16] 100 Wn.2d 520, 674 P.2d 650 (1983).

7

fear of the defendant because "the victim's state of mind itself was not relevant to any material issue before the before the jury."[17] There, the defendant asserted an insanity defense, claiming that he killed the victim because she was possessed by an evil spirit and on a "strong sorcery trip."[18] The victim's daughter and ex-husband testified that before the murder, the victim told them she feared the defendant. Because self-defense was not at issue and these statements were about the victim's state of mind, the court held that they were not admissible to prove the defendant's thought process at the time of the murder.[19]

But unlike here, Cameron did not involve a spousal murder, and there was no history of conflict and abuse between the defendant and the victim. And more importantly, the defendant in Cameron did not put at issue the nature of his relationship with the victim, nor did he claim that it affected his ability to form intent, as Schumacher did here. Thus, unlike here, what the victim in Cameron feared in the past was irrelevant to the defendant's state of mind at the time of the murder.

*ER 404(b) Evidence*

Schumacher also challenges the trial court's admission of evidence of his assault conviction in November 2010, testimony from his son and daughter about his past verbal and physical abuse of Jean, and Jean's statements to police that he had hit her in the past and had verbally and emotionally abused her for years before the

---

[17] Id. at 531.

[18] Id. at 523.

[19] Id. at 530-31.

November 2010 incident. He contends that such evidence was inadmissible under ER 404(b) because it was not probative of his motive or intent at the time of the murder. We disagree.

We review the decision to admit evidence of a defendant's prior bad acts for an abuse of discretion.[20] ER 404(b) provides that evidence of a defendant's prior misconduct may be admissible for a purpose other than to prove propensity, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." In cases of marital homicide, courts may properly admit evidence of prior bad acts to show motive, intent, opportunity, premeditation, and res gestae.[21] A diminished capacity defense puts at issue the defendant's state of mind because it allows the defendant to negate the requisite intent that is an element of a crime.[22]

Here, the trial court ruled that the prior incidents of domestic violence and conflict between Schumacher and his wife were relevant to prove Schumacher's motive and intent to cause the death of his wife and that the probative value outweighed any prejudice to Schumacher. As the court explained:

> Here, we have a first degree murder case where the State must prove not only intent, but the intent was a settled intent, and also must, in order to prevail, rebut the claim of diminished capacity. Although it's true that diminished capacity merely allows the jury to take evidence of mental illness or disorder into consideration in determining whether the defendant had the capacity to form a settled intent or a premeditated intent, the jury will not only look at expert evidence, such as the two doctors, but they will look at their—they will draw on their own common

---

[20] State v. Brown, 132 Wn.2d 529, 571-72, 940 P.2d 546 (1997).

[21] State v. Powell, 126 Wn.2d 244, 260-64, 893 P.2d 615 (1995).

[22] See State v. Stumpf, 64 Wn. App. 522, 525, 827 P.2d 294 (1992).

9

sense as to whether an older man, who has been married for 46 years to a woman, would suddenly bludgeon her to death without there being any discord or difficulties in the relationship, or whether, if this were to come out of the blue, what must it necessarily be or more likely be as a result of some sort of diminished capacity. So it's relevant to those claims, generally speaking. Moreover, while the 2010 incident in itself might not be evidence of settled intent, it is material to the State's argument that the defendant had a settled intent to do everything he could to prevent his wife from leaving him, and that over pretty much the entirety of their relationship, he had that intent, that he expressed it in violent and abusive ways to her, and was willing to do whatever was necessary to make sure she did not leave him.[23]

. . . .

. . . The evidence is not too remote. Certainly in 2010, there seemed to be some evidence that could come in that some people were seeing some changes in his thinking or behavior. And given his age, a jury might well speculate that, well, in 2010, he was also, perhaps, having some early dementia, and maybe this is what caused his behavior. So the issue is relevant to the issue of whether there is premeditated intent, and it is more probative than prejudicial; certainly, not unfairly prejudicial.[24]

The trial court's ruling was a proper exercise of discretion. The evidence was directly related to Schumacher's state of mind and intent at the time of the murder. He told police that he and Jean had been arguing for years and that this most recent argument is what caused him to finally act. He talked about his assault of Jean in 2010, being charged with a crime, having a protection order against him, having to stay away from the home for eight months, and that when he was allowed to go back home, "the bullshit started again."[25] He further stated that in the last few weeks before the murder, "she really started pissing and moaning" and that he decided he'd

---

[23] RP (May 14, 2013) at 133-35.

[24] RP (May 15, 2013) at 63-64.

[25] Ex. 241 at 14.

"had enough" and "could not take this anymore."[26] Finally, he stated that he was "seething" and did not sleep at all the night before the murder, and in the morning, he said to himself "[t]his is it" before proceeding to kill her.[27] Additionally, Schumacher himself put the nature of the marital relationship at issue. As discussed above, Schumacher's expert testified about the nature of the marital relationship and how the increasing conflict had an impact on his state of mind and ability to form the requisite intent.

Schumacher contends that evidence of the prior abuse and marital discord was not relevant because these acts were not close in time to the current offense. He notes that the most recent incident occurred in November 2010, nearly a year and a half before the charged offense. He cites State v. Acosta, where the court held inadmissible evidence of the defendant's prior arrests and convictions that were all at least two years old because they were irrelevant to his intent to commit the current offense.[28] But in Acosta, the State offered evidence of 23 arrests and convictions unrelated to the charged offense that dated back more than a decade to rebut a claim of diminished capacity.[29] The court held that because they involved unproven charges and charges unrelated to the crime charged, the prior arrests and convictions were not relevant to the defendant's state of mind during the current offenses.[30] As discussed above, this case is demonstrably different. The history of

---

[26] Id. at 15-16.

[27] Id. at 19.

[28] 123 Wn. App. 424, 435, 98 P.3d 503 (2004).

[29] Id. at 429-30.

[30] Id. at 434.

conflict and abuse was directly related to, and was what eventually led to, the charged offense.[31]

*Evidence of Statements Made to Medical Providers*

Schumacher contends that the trial court erroneously admitted evidence of statements Jean made to medical providers who treated her for injuries she sustained as a result of the November 2010 domestic violence assault incident. He contends that these statements do not fall within the scope of ER 803(a)(4), the medical diagnosis exception to the hearsay rule. But because Schumacher did not challenge the admission of this evidence on this basis at trial, he has waived the issue on appeal.[32] Nonetheless, his claim is without merit.

ER 803(a)(4) provides an exception to the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Such statements are admissible if (1) the declarant's motive in making the statement is consistent with the purpose of promoting treatment, and (2) the content of the statement must be that upon which a medical provider would reasonably rely in treatment or diagnosis.[33] "Medical diagnosis and treatment"

---

[31] This evidence was also material to the pattern of abuse aggravator.

[32] See State v. Simms, 77 Wn. App. 236, 240-41, 890 P.2d 521 (1995) (refusing to consider for the first time on appeal defendant's challenge to statements as not falling within ER 803(a)(4) hearsay exception).

[33] State v. Carol M.D., 89 Wn. App. 77, 85, 948 P.2d 837 (1997).

includes both physical and psychological treatment.[34] In domestic violence cases, our courts have routinely held admissible victims' statements to medical providers about the nature of the abuse and the identity of the abuser, recognizing the unique circumstances of such cases where the patient is in an intimate or familial relationship with the abuser, may be suffering from emotional or psychological injury due to long term abuse, and may be at risk of future harm from the same abuser.[35]

Here, an emergency room physician testified that Jean told him Schumacher verbally and emotionally abused her for years. A social worker also testified that Jean told her there was a history of verbal and emotional abuse and that Schumacher had hit and shoved her once before in the past. The court properly admitted these statements as reasonably pertinent to treatment because they contained information that enabled both providers to evaluate her condition and recommend treatment.

Schumacher contends that because these statements relate to a history of prior abuse, they are not reasonably pertinent to treatment of a present injury or condition and therefore do not fall with the medical diagnosis exception to the hearsay rule. But the scope of the rule is not limited to statements about treatment for injuries related to the charged offense, and Schumacher provides no authority to the contrary. Rather, the focus of the rule is reliability of the statements; so long as

---

[34] State v. Woods, 143 Wn.2d 561, 602, 23 P.3d 1046 (2001).

[35] See, e.g., Simms, 77 Wn. App. at 239-40; State v. Butler, 53 Wn. App. 214; 222, 766 P.2d 505 (1989); In re Dependency of S.S., 61 Wn. App. 488, 503, 814 P.2d 204 (1991).

they were made to facilitate treatment, they are sufficiently reliable hearsay.[36] Of course, they still must be relevant to a material issue in the case, but as discussed above, the court properly found that they were relevant to Schumacher's motive and intent to commit premeditated murder.

Schumacher also asserts that because these statements were in response to questions aimed solely at ensuring patient safety, they do not fall within the hearsay exception for statements of treatment or diagnosis, citing the Ninth Circuit's opinion in People of the Territory of Guam v. Ignacio.[37] Schumacher's reliance on Ignacio is misplaced. There, the court held inadmissible a child abuse victim's statements to a social worker where the record showed that the social worker questioned her simply to determine whether to report the suspected abuse to Child Protective Services, not for the purpose of treating or diagnosing the child's physical or psychological needs.[38] Statements the child made to the medical provider who initially examined her, however, were properly admitted.[39] Here, the testimony established that Jean's statements were not made solely to report the allegations but were made for the purpose of medical treatment and diagnosis.

---

[36] See Butler, 53 Wn. App. at 220 ("'[I]t is assumed that a patient has a strong motive to speak truthfully and accurately because the treatment or diagnosis will depend in part upon the information conveyed. The declarant's motive thus provides a sufficient guarantee of trustworthiness to permit an exception to the hearsay.'" (quoting United States v. Iron Shell, 633 F.2d 77, 84 (8th Cir. 1980))).

[37] 10 F.3d 608 (9th Cir. 1993).

[38] Id. at 613.

[39] Id.

*Sentencing Aggravator*

Schumacher challenges as unconstitutionally vague the sentencing aggravator of an ongoing pattern of psychological, physical, or sexual abuse of a victim and contends that his exceptional sentence based on this aggravator must be reversed. He concedes that our Supreme Court has expressly held in State v. Baldwin that the "the due process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines,"[40] but asserts that Baldwin is no longer good law after the United States Supreme Court's decision in Blakely v. Washington.[41] Blakely held that a judge may not impose a sentencing enhancement without findings by the jury or a stipulation by the defendant.[42]

Schumacher focuses on Blakely's treatment of aggravator factors as equivalent to elements of a crime, arguing that this establishes a due process right that encompasses vagueness challenges to sentencing enhancements. But Blakely implicated the right to a jury trial, while the vagueness doctrine focuses on providing notice to the public and protecting against arbitrary state intrusion.[43] Schumacher provides no cogent legal argument that Baldwin does not survive Blakely. Because we are bound by the court's decision in Baldwin, we reject the vagueness challenge.

Finally, Schumacher challenges the sufficiency of the evidence to support the finding of the aggravating factor of an ongoing pattern of psychological or physical

---

[40] 150 Wn.2d 448, 459, 78 P.3d 1005 (2003).

[41] 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[42] Id. at 303-04.

[43] Baldwin, 150 Wn.2d at 458.

abuse. Viewed in the light most favorable to the State, the evidence supports the finding.

A jury must find any facts supporting aggravating circumstances beyond a reasonable doubt.[44] We review the jury's finding under the standard for challenges to the sufficiency of the evidence.[45] Under that standard, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt.[46] We must draw all reasonable inferences from the evidence in favor of the State and construe the evidence most strongly against the defendant.[47]

Schumacher contends that the evidence shows only one or two prior incidents of past physical abuse and vague accounts of psychological abuse and is therefore insufficient to support an ongoing pattern of abuse. We disagree. Viewed in the light most favorable to the State, the evidence sufficiently demonstrates such a pattern.

Courts use the common meaning of "pattern," which is "'a regular, mainly unvarying way of acting or doing.'"[48] The evidence here establishes such a pattern. Schumacher's son recalled that for his "entire life," Schumacher would lose control and scream at Jean, calling her derogatory names.[49] His daughter similarly testified

---

[44] State v. Stubbs, 170 Wn.2d 117, 123, 240 P.3d 143 (2010).

[45] Id.

[46] State v. Zigan, 166 Wn. App. 597, 601-02, 270 P.3d 625 (2012).

[47] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[48] State v. Russell, 69 Wn. App. 237, 247, 848 P.2d 743 (1993) (quoting WEBSTER'S NEW WORLD DICTIONARY 1042 (1976)).

[49] See RP (May 29, 2013) at 14-15 (he called her a "fucking bitch," and "honky," a similar derogatory term used for Eastern European immigrants).

that he called Jean derogatory names while the daughter lived at home and after she moved out.[50] Schumacher also admitted to his son and at the hearing for a protection order in 2010 that he had been physically and verbally abusive many times in the past. Additionally, as discussed above, Jean told medical personnel in 2010 that he had been physically and verbally abusive to her for 43 years. Schumacher also stated that he argued with her one to two times a weeks for 40 years and admitted that he had threatened to kill her several times in the past. Based on this evidence, a rational trier of fact could find beyond a reasonable doubt that Schumacher engaged in a pattern of physical and emotional abuse of Jean for a prolonged period of time.

We affirm the judgment and sentence.

WE CONCUR:

---

[50] See id. at 52 ("[T]he defendant would call my mother a bitch, a whore, a cunt, a mother fucking cunt, a honky, an asshole, bitch.").

17