# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48321-1-II |
| Respondent, | |
| v. | |
| AZARIAH CHENAZ ROSS, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Azariah Chenaz Ross appeals his convictions of two counts of burglary in the first degree, three counts of robbery in the first degree, six counts of unlawful imprisonment, four counts of trafficking in stolen property in the first degree, and one count of theft of a firearm. He argues that the trial court erred by admitting his statements to the police and by failing to enter written findings of fact and conclusions of law. He also argues the information failed to sufficiently provide notice, insufficient evidence supported the theft of a firearm conviction, the prosecutor committed misconduct, and his convictions of unlawful imprisonment must merge with his burglary and robbery convictions or violate double jeopardy. As to his sentence, Ross argues that his unlawful imprisonment convictions constitute the same criminal conduct as his robbery convictions.

Ross also raises numerous issues in a statement of additional grounds (SAG). We affirm Ross's convictions.

FACTS

I.   THE ROBBERIES

Between January 25 and August 26, 2012, a series of seven home invasion robberies occurred in a single neighborhood in southeast Tacoma.

A.   FERNANDEZ RESIDENCE

In the early evening of May 10, 2012, Ross and another man broke into the residence of Remegio and Norma Fernandez through their back patio. One of the men pointed a gun with a laser sight at Mr. Fernandez. The men demanded jewelry the Fernandezes were wearing and money. They took gold jewelry from the Fernandezes. The intruders then ransacked the Fernandezes' bedroom searching for money. They found more jewelry in a briefcase. At one point, Mr. Fernandez tried to escape, but the men caught him and subsequently tied him up in the bathroom. The man with the gun punched and kicked Mr. Fernandez and put the barrel of the gun in his mouth, warning him not to "try it again." 7 Report of Proceedings (RP) at 925.

The intruders were in the residence for approximately three hours. Before leaving, they told the Fernandezes not to move because they had friends waiting nearby who would come back and beat them up if they tried anything.

Mr. Fernandez made a list of items the intruders took, including a .22 caliber pistol, a laptop computer, an Xbox 360 console, and approximately $5,500 in cash. They also took jewelry belonging to Mrs. Fernandez's daughter.

B.   ENG-YU-MOO RESIDENCE

On June 29, Rany Eng resided with her eleven-year-old daughter, Abby Eng Cui, and a couple, Hing Yu and Theim Moo. In the early evening, Eng entered her house and encountered two intruders, one of whom was Ross. One of them pointed a gun at her and ordered her to sit.

2

One went upstairs while the other remained with Eng and the other residents. The intruder who remained downstairs tied Eng's hands and feet. He then asked her, "[y]ou want to die?" 7 RP at 1162.

Yu tried to run and call for help and managed to push an alarm button multiple times. He made it to the back door before the intruder caught him and pulled him back in the house. The intruder hit Yu with the gun. One of the intruders also pulled down a security camera and threw it at Moo, hitting her in the face. The camera also struck Cui. The men broke the other seven security cameras in the house.

Shortly after the intruders left, the police arrived, responding to the alarm.

Eng made a list of items taken from her, including jewelry and $8,000 in currency.

C.     OTHER ROBBERIES AND INVESTIGATION

Similar crimes occurred on five other occasions in 2012. Robbery detectives Timothy Griffith and Robert Baker investigated them.

On July 12, Griffith interviewed an inmate at the Pierce County Jail. Based on the inmate's tip, Griffith and Baker listened to several recorded phone calls made by an inmate at the Pierce County Jail. The inmate was Ross's brother, Azias Ross.[1] In the calls, Azias incriminated Ross.

II.     ARREST AND INTERROGATION

In August, police arrested Ross, Azias, and three other suspects: Nolan Chouap, Alicia Ngo, and Soy Oeung. When arrested, Ross possessed three Ziploc bags containing jewelry, a pouch containing five watches, and another pouch with more jewelry. He also had a wad of cash containing 56 hundred-dollar bills and various smaller denominations. The victims from one of the incidents identified much of the jewelry as theirs.

---

[1] To avoid confusion, we refer to Azias Ross as "Azias." We intend no disrespect.

The detectives interviewed Ross after he had been in a holding cell for approximately ten and a half hours. They read Ross his *Miranda*[2] rights and he initialed and confirmed that he understood them. The interview lasted approximately two hours.

During the course of the interview, Ross admitted to having taken part in the crimes, including those at the Fernandez and Eng-Yu-Moo residences. Ross also told the detectives he sold stolen gold jewelry to a man at a watch repair kiosk that didn't take Ross's name down.

III. PRETRIAL PROCEEDINGS

On August 30, the State charged Ross with 57 counts, including conspiracy to commit burglary in the first degree, conspiracy to commit robbery in the first degree, burglary in the first degree, robbery in the first degree, unlawful imprisonment, assault in the second degree, trafficking in stolen property, and theft of a firearm. The State included Chouap, Oeung, Ngo, and Azias as codefendants but Ross eventually went to trial as the sole defendant.

A. CONFESSION HEARING

The court held a confession hearing pursuant to CrR 3.5 on the admissibility of Ross's statements to the police. Griffith testified that he believed Percocet pills had been found in the interrogation room, but he did not recall Ross being under the influence of drugs during the interrogation. Griffith did not notice "any indications" of Ross being "high on drugs." RP (Aug. 19, 2013) at 37. Baker also did not recall Ross being high on pills during the interview. He testified that he had destroyed his notes of the interview because Griffith had written the report.

The court found that Ross had stated he understood his rights and he never asked for an attorney or for the interview to stop. It also found that there was no indication that Ross was high or on drugs during the interview. It found there was no evidence to support Ross's arguments that

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

he had been under the influence of Percocet during the interview, despite counsel's "questions and innuendos" to the contrary. Clerk's Papers (CP) at 216. The court ruled that all of Ross's statements were admissible.

The court did not enter any written findings of fact or conclusions of law after the hearing. However, after Ross had filed his notice of appeal and opening brief, the court issued its written findings of fact and conclusions of law. It concluded that there was "no evidence the defendant was on Percocet at the time of the interview" and that Ross's statements to the detectives were admissible. CP at 1053. It further concluded that Ross made a "knowing, voluntary, and intelligent waiver of his Miranda rights after fully understanding them."[3] CP at 1053-54.

B.     SECOND AMENDED INFORMATION

On June 12, 2015, the State filed its second amended information. The charges that would go to trial consisted of: 1 count of conspiracy to commit robbery in the first degree and/or burglary in the first degree, 7 counts of burglary in the first degree, 14 counts of robbery in the first degree, 18 counts of unlawful imprisonment, 7 counts of trafficking in stolen property in the first degree, 2 counts of theft of a firearm, and 3 counts of assault in the second degree. The burglary counts each specified the date on which the alleged burglary took place, but did not identify the addresses where each occurred or provide any other details of the specific burglaries. The robbery counts provided each victim's last name and first initial but did not identify what property was stolen or

---

[3] Ross did not testify at the 3.5 hearing. Approximately two years later at trial, Ross would testify that he often took eight-to-ten 30mg Percocet pills per day. He testified that he had taken two pills the morning he was arrested and then another while in the holding cell prior to his interview with the detectives. He also testified that during the interview two pills fell out of his pocket onto the floor and he asked Baker if he could have them back. He testified that the detectives talked about the Percocet pills on the floor and decided they would "talk about that later." 20 RP at 2751. Because none of this evidence was proffered or admitted at the confession hearing, we do not consider it when reviewing the court's ruling on the admissibility of the confession.

the locations where the robberies occurred. The unlawful imprisonment counts specified the date on which the alleged crimes took place but did not specify the victims or any other details.

IV. TRIAL

A. MOTION TO DISMISS

On the eighteenth day of trial, after the State rested its case, Ross moved to dismiss all counts in the second amended information. He argued that the information was constitutionally deficient as to the robbery counts because it did not identify what property was taken from each victim, where that property was taken, and the identity of each victim. He argued it was deficient as to the burglary counts for failing to identify the addresses where the alleged burglaries had occurred. He argued it was deficient as to the unlawful imprisonment counts for failing to identify the victims of each individual count. He argued that the trafficking in stolen property counts were deficient because they failed to identify the stolen property that was trafficked. Finally, he argued that the theft of a firearm counts were deficient because the information did not "identify which firearms were stolen." CP at 410.

After the trial court heard arguments on Ross's motion to dismiss, it ruled that "the essential elements are in fact set forth as to each crime" and that the information was not constitutionally deficient. 18 RP at 2450. It concluded that "the information [was] in fact constitutionally sufficient because as to each crime that [was] alleged, the essential elements of the crime [were] set forth." 18 RP at 2451.

In so ruling, the court stated that any deficiency as to specific facts was "the kind of information that could have been addressed with a bill of particulars." 18 RP at 2452. The prosecutor then voluntarily offered an oral bill of particulars to address any remaining issues. The

6

prosecutor provided the addresses for the burglary counts and the victims of the unlawful

imprisonment counts. He also clarified the names of the robbery victims.

B.    CLOSING ARGUMENTS

During the prosecutor's closing arguments, the following exchange occurred:

> [Prosecutor]: These crimes were horrible. These victims—and these are just some of them—these victims all believed, as everyone does, that their home is a place of sanctuary, a place of safety, a place of joy, a place where you raise your families. Everyone understands that if you go out into the community, you might, if you are in the wrong place at the wrong time, succumb to violence.
> No one should believe, as these victims now do—
> [Defense Attorney]: Your honor, I am going to object to this type of argument on the lines of Claflin[4] and the recent Division II cases as an improper basis for urging a conviction.
> The Court: I will sustain as to what the victims felt.
> [Defense Attorney]: And move to strike.
> The Court: Stricken.
> [Prosecutor]: No one should believe that their homes are not safe. No one should believe that their homes might be the wrong place—
> [Defense Attorney]: I am going to object to this basically as an attempt to get in that testimony or that argument as improper.
> The Court: Overruled.
> [Prosecutor]: For these victims, they suffered horrendous crimes. The idea that you could be at home watching TV or having dinner or asleep in your bed and men like the defendant and Nolan Chouap wearing masks and guns would come barreling into your homes? It's unimaginable that these victims would be threatened with their lives, threatened with their safety. It's horrible.
> [Defense Attorney]: Your honor, I am going to object to this under the Claflin line of cases. I think the State's burden is to prove it beyond a reasonable doubt and not to emote.
> The Court: Overruled.
> [Prosecutor]: That these victims, imagine these victims were told, "If you don't give us what we want, we will kidnap your grandkids. If you don't stop fighting with us, we will kill your son." It's horrible. And it is for these actions, not once or twice or three times or four times or five times or six times, seven different times, these actions, families went through this. And for this, justice demands accountability, and the accountability will come through your verdict forms.
> [Defense Attorney]: Your honor, I object to this argument as urging a conviction on improper ground. The State's—
> The Court: Sustained—

---

[4] *State v. Claflin*, 38 Wn. App. 847, 690 P.2d 1186 (1984).

> [Defense Attorney]: Thank you
> The Court: —as to form.

21 RP at 2825-27. The trial court sustained an objection as to "what the victims felt" when the prosecutor discussed the victims' feelings of security in their respective homes. 21 RP at 2825. It overruled defense objections that the prosecutor's arguments were "an attempt to get in that testimony or that argument" and to "prove it beyond a reasonable doubt and not to emote." 21 RP at 2825-26. It then sustained an objection to the last paragraph for "urging a conviction on improper ground." 21 RP at 2127. At no point during this exchange did the trial court instruct the jury to disregard the prosecutor's comments.

After the trial, Ross moved for a new trial on numerous grounds, including prosecutorial misconduct in closing arguments. The court denied the motion, finding that the prosecutor was just "acknowledging the nature of the criminal acts," as defense counsel had done in her own closing. RP (Oct. 12, 2015) at 20. It ruled that, "even if there was error in the prosecutor's argument," that it had not created an unfair trial. RP (Oct. 12, 2015) at 20.

C.    VERDICT

On September 1, 2015, the jury found Ross guilty of two counts of burglary in the first degree, three counts of robbery in the first degree, six counts of unlawful imprisonment, four counts of trafficking in stolen property, and one count of theft of a firearm. All of these counts related to the Fernandez and Eng-Yu-Moo residences, except for the trafficking counts. It found that firearm enhancements had been proven beyond a reasonable doubt on all of the burglary, robbery, and unlawful imprisonment counts. It found Ross not guilty of all the counts stemming from a January 25, 2012 robbery. The jury could not reach verdicts as to the remaining counts. The court declared a mistrial as to those counts.

8

D. SENTENCE

At sentencing, Ross argued that his unlawful imprisonment convictions constituted the same criminal conduct as his robbery convictions. He further argued that the theft of a firearm conviction constituted the same criminal conduct as the underlying robbery. He also argued that the burglary convictions served "no independent purpose" and the court should use its discretion under the antimerger burglary statute to conclude they were the same criminal conduct as the robberies. RP (Oct. 12, 2015) at 24. The court concluded that the theft of a firearm conviction merged with the robbery conviction and that none of the other convictions merged.

Ross also argued that insufficient evidence sustained his theft of a firearm conviction because no evidence proved the firearm was operational. The court rejected this argument.

The court entered judgment against Ross. It found that the theft of a firearm count constituted the same criminal conduct as one of the burglary counts and did not order any time on that count. In total, the trial court sentenced Ross to 564 months in custody[5] and ordered him to undergo a substance abuse evaluation.

---

[5] The sentence consisted of 84 months for each trafficking in stolen property conviction, 116 months for each burglary conviction, 156 months for each robbery conviction, and 60 months for each unlawful imprisonment conviction. It ordered a further 60 months for each robbery and burglary firearm enhancement and 18 months for each unlawful imprisonment firearm enhancement. The sentences for the crimes were to run concurrent, totaling 156 months, while the sentences for the firearm enhancements were to run consecutive, totaling 408 months. The total sentence thus amounted to 564 months.

ANALYSIS

I.    CONFESSION HEARING

Ross argues that the court erred by admitting his statements to Detectives Griffith and Baker because he was addicted to and under the influence of Percocet during the interview, which made him incapable of voluntarily and intelligently consenting to waive his *Miranda* rights. The court did not err.

"Under *Miranda v. Arizona*, a confession is voluntary, and therefore admissible, if made after the defendant has been advised concerning rights and the defendant then knowingly, voluntarily and intelligently waives those rights." *State v. Aten*, 130 Wn.2d 640, 663, 927 P.2d 210 (1996) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). The court should consider whether the confession was voluntary "from a totality of the circumstances under which it was made." *Aten*, 130 Wn.2d at 663-64. It should take into account the "defendant's mental disability and use of drugs at the time of a confession . . . , but those factors do not necessarily render a confession involuntary." *Aten*, 130 Wn.2d at 664.

The burden to show an intelligent and voluntary waiver of *Miranda* rights is on the State by a preponderance of the evidence. *State v. Woods*, 34 Wn. App. 750, 759, 665 P.2d 895 (1983). We review *Miranda* claims de novo. *State v. Daniels*, 160 Wn.2d 256, 261, 156 P.3d 905 (2007). However, "findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997).

The trial court concluded that "[t]here [was] no evidence the defendant was on Percocet at the time of the interview. Defense counsel's questions to Det. Baker and Det. Griffith included

10

innuendo regarding the defendant's alleged Percocet use, however counsel's questions and innuendo are not evidence." CP at 1053.

The detectives advised Ross of his *Miranda* rights and asked him if he understood them before asking him any substantive questions. Ross stated he understood his rights and initialed on a form that he understood. Ross then agreed to an interview. Neither side produced any evidence at the confession hearing that Ross was under the influence of Percocet or any other intoxicant at the time of the interview. Griffith testified that he believed "there were some [Percocet pills] found in the [interview] room," but this testimony did not indicate that Ross was intoxicated. RP (Aug. 19, 2013) at 36.

Because no evidence indicated that Ross was intoxicated at the time of the interview, we conclude that substantial evidence supports the trial court's finding that no evidence existed to show intoxication. The court did not err in admitting Ross's statements.

II.    WRITTEN FINDINGS AND CONCLUSIONS

Ross argues that the trial court failed to comply with CrR 3.5(c) by not issuing written findings of fact and conclusions of law after the confession hearing. He contends that the court's failure to do so requires us to remand for entry of the missing findings and conclusions. We disagree with Ross.

After a confession hearing, the trial court must "set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether the statement is admissible and the reasons therefor." CrR 3.5(c). The remedy for a trial court's failure to enter written findings of fact and conclusions of law when required is "remand for entry of written findings and conclusions." *State v. Head*, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998). Reversal may also be appropriate if a defendant is able to show "prejudice resulting from

11

the lack of written findings and conclusions" if there is "strong indication that findings ultimately entered have been 'tailored' to meet issues raised on appeal." *Head*, 136 Wn.2d at 624-25. The "burden of proving any such prejudice will be on the defendant" and can only be shown after remand and the entry of findings. *Head*, 136 Wn.2d at 625 & n.3.

The trial court's late findings and conclusions in this case are almost identical to its oral ruling. In its oral ruling the court found that there was "no evidence that the defendant was under the influence at the time he was interviewed." CP at 217. It concluded that the State had met its burden to show by a preponderance of the evidence "that the statements made by each defendant were made knowingly, voluntarily and intelligently" and thus admissible. CP at 221. In its written findings and conclusions, it reiterated there was "no evidence the defendant was on Percocet at the time of the interview" and that Ross "made a knowing, voluntary and intelligent waiver of his Miranda rights after fully understanding them." CP at 1053-54.

In this case, Ross does not allege any prejudice resulted from the trial court's delay in entering written findings and conclusions. He requests that we remand for entry of the required findings and conclusions, but the trial court has since entered its findings and conclusions at request of the State. We decline Ross's invitation to remand the case and accept the written findings and conclusions.

III.    SUFFICIENCY OF INFORMATION

Ross argues that the second amended information did not contain the "necessary elements" of the crimes of burglary in the first degree, robbery in the first degree, or unlawful imprisonment as to the Fernandez and Eng-Yu-Moo incidents. Br. of Appellant at 41. He contends that "the information was defective regarding the relevant counts because it failed to include specific facts" supporting the criminal allegations. Br. of Appellant at 45.

12

A.     LEGAL PRINCIPLES

A charging document "is constitutionally adequate only if all essential elements of a crime, statutory and nonstatutory, are included in the document so as to apprise the accused of the charges against him or her and to allow the defendant to prepare a defense." *State v. Vangerpen*, 125 Wn.2d 782, 787, 888 P.2d 1177 (1995).   This requirement "has long been settled law in Washington and is based on the federal and state constitutions and on court rule." *Vangerpen*, 125 Wn.2d at 786 (footnotes omitted).   RCW 10.37.052(2) also clarifies that an indictment or information must contain "[a] statement of the acts constituting the offense, in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

These requirements serve to inform the defendant of the charges against him and allow him to prepare a defense. *State v. Kiliona-Garramone*, 166 Wn. App. 16, 22, 267 P.3d 426 (2011).  "A charging document is constitutionally sufficient if the information states each statutory element of the crime, even if it is vague as to some other matter significant to the defense." *Kiliona-Garramone*, 166 Wn. App. at 22.  To determine the essential elements of the crime, we look to the statutory language and construe the statute so as to avoid an absurd result. *Kiliona-Garramone*, 166 Wn. App. at 22.

B.     FACTUAL SPECIFICITY

Ross argues that the information failed to include "specific facts" supporting the allegations against him. Br. of Appellant at 45.  He lists numerous factual deficiencies in his burglary, robbery, and unlawful imprisonment counts.  He does not allege that the information failed to include any

"essential elements" of the crimes charged. He only complains that it "lacked the minimal factual specificity required by *Leach*,[6] and was factually deficient." Br. of Appellant at 46.

While the charging document must include the "essential elements" of the crime charged, it is not required to allege "specific facts." *State v. Laramie*, 141 Wn. App. 332, 338, 340, 169 P.3d 859 (2007). A failure to allege specific facts "may render the charging document vague, but it is not constitutionally defective." *Laramie*, 141 Wn. App. at 340. A vague charging document "may be corrected under a bill of particulars." *State v. Leach*, 113 Wn.2d 679, 687, 782 P.2d 552 (1989). Where a defendant fails to request a bill of particulars at trial, he waives any challenge to the charging instrument for vagueness. *State v. Mason*, 170 Wn. App. 375, 385, 285 P.3d 154 (2012). A defendant therefore "may not challenge a charging document for 'vagueness' on appeal if no bill of particulars was requested at trial." *Leach*, 113 Wn.2d at 687.

In *State v. Winings*, we clarified that *Leach* "does not impose any additional requirement that the State allege facts beyond those that sufficiently support the elements of the crime charged or that the State describe the facts with great specificity." 126 Wn. App. 75, 85, 107 P.3d 141 (2005). Even if a charging document does fail to allege specific facts, this failure may render the charging document vague, but it does not render it constitutionally deficient. *Laramie*, 141 Wn. App. at 340.

---

[6] *State v. Leach*, 113 Wn.2d 679, 782 P.2d 552 (1989).

Because Ross did not request a bill of particulars at trial, he has waived any arguments as to the factual vagueness of the charging instrument. In any event, the information was not constitutionally defective.[7]

IV.     SUFFICIENCY OF THE EVIDENCE

Ross claims his theft of a firearm conviction was not supported by sufficient evidence and that the trial court erred by denying his motion to dismiss the conviction. He argues that no evidence existed that the weapon Ross stole was "an operable firearm." Br. of Appellant at 4.

RAP 10.3(a)(6) directs each party to supply in its brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." "We do not consider conclusory arguments unsupported by citation to authority." *Mason*, 170 Wn. App. at 384. "'[P]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *Mason*, 170 Wn. App. at 384 (quoting *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012)).

Because Ross has neither provided any substantive argument in his brief on whether the State must prove the firearm was "operable," nor cited to any authority supporting his assertions, we do not consider the issue further.

V.     PROSECUTORIAL MISCONDUCT

Ross argues that the prosecutor appealed to "jurors' passions and prejudices" in closing arguments by inviting them "to convict Azariah based on a sense of social 'accountability' and appeal to a sense of fear that the victims experienced." Br. of Appellant at 52. He claims that this

---

[7] Insofar as Ross's arguments can be construed to claim that the names of the victims constitute "essential elements" of the crimes, we have repeatedly held that the name of the victim is not an essential element of a crime. *State v. Johnston*, 100 Wn. App. 126, 134, 996 P.2d 629 (2000); *State v. Plano*, 67 Wn. App. 674, 679-80, 838 P.2d 1145 (1992). We reject this contention.

"flagrant instance of misconduct" denied him a fair trial and requires reversal of his conviction and remand for retrial. Br. of Appellant at 53. We disagree with Ross.

A.    STANDARD OF REVIEW

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). An appellant claiming prosecutorial misconduct must demonstrate that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-61, 278 P.3d 653 (2012). To establish prejudice, the appellant must show that the improper comments had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 760. "'Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard.'" *State v. Thorgerson*, 172 Wn.2d 438, 460, 258 P.3d 43 (2011) (quoting *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)). "We review a prosecutor's purportedly improper remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury." *State v. Pierce*, 169 Wn. App. 533, 552, 280 P.3d 1158 (2012).

B.    IMPROPER ARGUMENT

Ross argues that the prosecutor improperly appealed to the jurors' passions and prejudices rather than encouraging them render a verdict based solely on the evidence. Specifically, he takes issue with the prosecutors' comments about how "everyone" should feel safe in the sanctuary of their homes and his appeal to "a sense of fear that the victims experienced. Br. of Appellant at 50, 52.

In closing arguments, a prosecutor "is not barred from referring to the heinous nature of a crime but nevertheless retains the duty to ensure a verdict 'free of prejudice and based on reason.'" *Pierce*, 169 Wn. App. at 553 (quoting *State v. Claflin*, 38 Wn. App. 847, 849-50, 690 P.2d 1186

(1984)). "[A] prosecuting attorney has wide latitude to draw and express reasonable inferences from the evidence." *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006). Prosecutors have a duty, however, "to seek verdicts free from appeals to passion or prejudice." *Perez-Mejia*, 134 Wn. App. at 915.

Ross first argues the prosecutor's argument about the victims' feeling of safety in their homes was improper. It is "improper for the prosecutor to step into the victim's shoes and become his representative." *Pierce*, 169 Wn. App. at 554. In the present case, the prosecutor argued that "[n]o one should believe, as these victims now do . . ." before being cut off by the defense's successful objection. 21 RP at 2825. His statements before that, that "these victims all believed, as everyone does, that their home is a place of sanctuary, a place of safety, a place of joy, a place where you raise your families" also stepped into how the victims of the crimes felt. 21 RP at 2825. These statements were improper.

We also agree with Ross that the following argument was improper:

[I]magine these victims were told, "If you don't give us what we want, we will kidnap your grandkids. If you don't stop fighting with us, we will kill your son." It's horrible. And it is for these actions, not once or twice or three times or four times or five times or six times, seven different times, these actions, families went through this. And for this, justice demands accountability, and the accountability will come through your verdict forms.

21 RP at 2826-27. These statements are similar to those made by the prosecutor in *Pierce.* They are "an improper appeal to passion and prejudice" that "served no purpose but to appeal to the jury's sympathy." *Pierce*, 169 Wn. App. at 555.

C.    NO PREJUDICE

Where, as here, the defense objects at trial, "the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Emery*, 174 Wn.2d at 760. Although the prosecutor's comments improperly appealed to the

sympathy and passions of the jury, the trial court sustained defense counsel's objections to the improper comments.

The court also struck argument as to what the victims felt. It did not, however, instruct the jury to disregard any of these prosecutor's statements. However, the jury instructions did direct the jury "to remember that the lawyers' statements are not evidence", CP at 466, and the jury is "presumed to follow the instruction that counsel's arguments are not evidence." *State v. Warren*, 165 Wn.2d 17, 29, 195 P.3d 940 (2008).

When the trial court sustains an object, a motion to strike or direction for the jury to disregard is not required. Ross cannot show prejudice where the trial court sustained a defense objection on the basis that it did not additionally order the improper arguments stricken.

Further, in assessing prejudice, we consider that the jury convicted Ross of 16 counts, acquitted him of 4 counts, and hung on 32 counts after five days of deliberations. If the jury were swayed by the prosecutor's improper appeal to their passions, it seems unlikely that it would have returned a verdict convicting him of less than a third of the charged offenses. Here, where the court sustained objections to the prosecutor's improper comments, we conclude that the comments did not have a substantial likelihood of affecting the jury's decision.

VI.    DOUBLE JEOPARDY & MERGER

Ross contends that his unlawful imprisonment convictions merge with his robbery and burglary convictions. We disagree.

A.    LEGAL PRINCIPLES

We review double jeopardy claims de novo. *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010). "The United States Constitution provides that a person may not be subject 'for the same offense to be twice put in jeopardy of life or limb.'" *State v. Chouap*, 170 Wn. App. 114,

122, 285 P.3d 138 (2012) (quoting U.S. CONST. amend. V). "Similarly, the Washington Constitution provides that a person may not be put in jeopardy twice for the same offense." *Chouap*, 170 Wn. App. at 122; WASH. CONST. art. I, § 9.

Where a defendant is convicted under multiple criminal statutes for a single act, the court must determine whether the legislature intended multiple punishments, first by looking to the statutory language. *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 536, 167 P.3d 1106 (2007). Where the language of the statutes are silent on this point, we apply the "same evidence" test. *State v. Louis*, 155 Wn.2d 563, 569, 120 P.3d 936 (2005). "Under the same evidence test, double jeopardy is deemed violated if a defendant is 'convicted of offenses that are identical both in fact and in law.'" *Louis*, 155 Wn.2d at 569 (quoting *State v. Calle*, 125 Wn.2d 769, 777, 888 P.2d 155 (1995)).

The merger doctrine, "independent of double jeopardy concerns, evaluates whether the legislature intended multiple crimes to merge into a single crime for punishment purposes." *State v. Novikoff*, 1 Wn. App. 2d 166, 172-73, 404 P.3d 513 (2017). "The judiciary has developed the merger doctrine over time as an extension of double jeopardy principles." *State v. Berg*, 181 Wn.2d 857, 864, 337 P.3d 310 (2014). Merger is a "doctrine of statutory interpretation used to determine whether the Legislature intended to impose multiple punishments for a single act which violates several statutory provisions." *State v. Vladovic*, 99 Wn.2d 413, 419 n.2, 662 P.2d 853 (1983). This doctrine applies when "in order to prove a more serious crime, the State must prove an act that a statute defines as a separate crime." *Novikoff*, 1 Wn. App. 2d at 173.

As with double jeopardy, "the ultimate question is whether the legislature intended separate punishment." *Novikoff*, 1 Wn. App. 2d at 173. Even "if two convictions would appear to merge on an abstract level under this analysis, they may be punished separately if the defendant's

particular conduct demonstrates an independent purpose or effect of each." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008).

The crime of unlawful imprisonment is defined in Washington as: "A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.040(1). "Restrain" is further defined as:

> [T]o restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty. Restraint is "without consent" if it is accomplished by (a) physical force, intimidation, or deception, or (b) any means including acquiescence of the victim, if he or she is a child less than sixteen years old or an incompetent person and if the parent, guardian, or other person or institution having lawful control or custody of him or her has not acquiesced.

RCW 9A.40.010(6).

B. BURGLARY

Ross first argues that his unlawful imprisonment counts merge with his burglary counts and must be dismissed.

The Washington Legislature has adopted a burglary "antimerger statute" which states: "Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately." RCW 9A.52.050. This statute provides an "exception to the merger doctrine" because it shows that "the legislature intended that crimes committed during a burglary do not merge when the defendant is convicted of both." *State v. Elmore*, 154 Wn. App. 885, 900, 228 P.3d 760 (2010).

Ross does not provide any substantive argument about how his unlawful imprisonment convictions should merge with his burglary convictions other than the general statement that the unlawful imprisonment of the victims was "incidental to the separate convictions for first-degree robbery and first-degree burglary." Br. of Appellant at 56. He does not acknowledge the burglary

20

antimerger statute nor argue why it should not apply in this case. The burglary antimerger statute prevents Ross' unlawful imprisonment convictions from merging with his convictions for burglary in the first degree.

C.    ROBBERY

Washington law defines robbery as:

A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

RCW 9A.56.190. Robbery constitutes robbery in the first degree when "[i]n the commission of a robbery or of immediate flight therefrom, [the defendant]: (i) Is armed with a deadly weapon; or (ii) Displays what appears to be a firearm or other deadly weapon; or (iii) Inflicts bodily injury." RCW 9A.56.200(1)(a).

*Berg* declared that "the law is now settled that just as kidnapping can never merge into robbery, neither can robbery merge into kidnapping." 181 Wn.2d at 866. Ross seeks to distinguish *Berg* in that "[u]nlike the 'pure kidnapping'" in that case, "the instances of unlawful imprisonment in this case are incidental to the robbers' clearly-stated goal" of "obtain[ing] gold, jewelry, weapons, electronics, and other tangible items." Br. of Appellant at 58.

In *Berg*, the defendants broke into the victim's garage where he kept marijuana plants, pointed a gun at his head and ordered him to get on the ground. 181 Wn.2d at 861. One defendant held the victim down with a gun pointed at his head, while the other took the victim's wallet and phone and ripped up all his marijuana plants. *Berg* 181 Wn.2d at 861. The victim was pinned to

the ground for about thirty minutes and threatened with death whenever he tried to move beneath the defendant's knee. *Berg*, 181 Wn.2d at 861.

The court determined that a jury could conclude that the above facts established "restraint" to meet that element of kidnapping. *Berg*, 181 Wn.2d at 872. It held that whether a kidnapping is "incidental to [a] robbery is immaterial to the sufficiency of the evidence of kidnapping." *Berg*, 181 Wn.2d at 861.

Ross' attempts to distinguish the present case from *Berg* are unconvincing. He argues that this case is different from *Berg* because that case involved a "pure kidnapping" while in this case unlawful imprisonment was "incidental" to Ross' "clearly-stated goal" of robbing the victims. Br. of Appellant at 58. He claims that *State v. Korum* should be controlling because that was another case where the defendant was "charged with 'home invasion' robberies during which the victims were bound." Br. of Appellant at 59 (citing 120 Wn. App. 686, 689, 707, 86 P.3d 166 (2004), *rev'd on other grounds by State v. Korum*, 157 Wn.2d 614, 141 P.3d 13 (2006)).

Ross's reliance on *Korum* is in error. *Korum* did not decide on the issue of whether the defendant's kidnapping convictions merged with his home invasion robberies, but instead interpreted *State v. Green*, 94 Wn.2d 216, 227, 616 P.2d 628 (1980), to conclude that there is insufficient evidence of kidnapping when it is "incidental" to another crime. 120 Wn. App. at 703-04. *Berg* sought to "reinforce the distinction between concepts of merger and sufficiency of the evidence." *Berg*, 181 Wn.2d at 872. It clarified that:

> This court has never held that evidence of kidnapping is insufficient where the kidnapping conduct is incidental to another crime as a matter of due process. Instead, kidnapping conduct incidental to another crime has been addressed as an issue of merger and we have held that kidnapping and robbery never merge.

*Berg*, 181 Wn.2d at 872. Accordingly, the Supreme Court has firmly established that kidnapping does not merge into robbery.

We conclude that unlawful imprisonment does not merge into robbery. Like kidnapping in the first degree,[8] unlawful imprisonment requires that the defendant "restrain[ ]" the victim. RCW 9A.40.040. It is a lesser included offense of kidnapping. *State v. Davis*, 177 Wn. App. 454, 461, 311 P.3d 1278 (2013). Because robbery in the first degree does not require this element, unlawful imprisonment, like kidnapping in the first degree, does not merge with it. We affirm Ross' unlawful imprisonment convictions.

VII. SAME CRIMINAL CONDUCT

Ross argues that, if his unlawful imprisonment convictions do not merge with his burglary and robbery convictions, that they constitute the same criminal conduct for purposes of sentencing.

A. LEGAL PRINCIPLES

For sentencing purposes, "[m]ultiple offenses encompass the same criminal conduct if the crimes involve the same (1) objective criminal intent, (2) time and place, and (3) victim." *State v. Walker*, 143 Wn. App. 880, 890, 181 P.3d 31 (2008). If any of the three elements is missing, "a trial court must count multiple offenses separately when calculating a defendant's offender score." *Walker*, 143 Wn. App. at 890. We review determinations of same criminal conduct "for abuse of discretion or misapplication of law." *State v. Graciano*, 176 Wn.2d 531, 535, 295 P.3d 219 (2013). Under this standard, "when the record supports only one conclusion on whether crimes constitute the 'same criminal conduct,' a sentencing court abuses its discretion in arriving at a contrary result." *Graciano*, 176 Wn.2d at 537-38. Where the record "adequately supports either conclusion, the matter lies in the court's discretion." *Graciano*, 176 Wn.2d at 538. The burden is

---

[8] Kidnapping requires "[a]bduct[ion]," defined as: "to restrain a person by either (a) secreting or holding him or her in a place where he or she is not likely to be found, or (b) using or threatening to use deadly force. RCW 9A.40.010.

on the defendant to "establish the crimes constitute the same criminal conduct." *Graciano*, 176 Wn.2d at 539.

> B.      FERNANDEZ RESIDENCE

The State does not dispute that the two robbery convictions and two unlawful imprisonment convictions at the Fernandez residence occurred at the same time and place and against the same victims. Rather, it argues that the crimes did not involve the same intent.

In construing "the 'same criminal intent' prong, the standard is the extent to which the criminal intent, objectively viewed, changed from one crime to the next." *State v. Vike*, 125 Wn.2d 407, 411, 885 P.2d 824 (1994). "'Intent, in this context, is not the particular *mens rea* element of the particular crime, but rather is the offender's objective criminal purpose in committing the crime.'" *State v. Phuong*, 174 Wn. App. 494, 546, 299 P.3d 37 (2013) (quoting *State v. Adame*, 56 Wn. App. 803, 811, 785 P.2d 1144 (1990)).

The evidence produced in the case indicated that Chouap and Ross entered the Fernandezes' home in order to rob them. However, it also shows that they bound Mr. Fernandez's hands and legs and locked both Fernandezes in the bathroom. The Fernandezes' restraint required a different criminal intent, the intent to materially restrain their liberty, than the robbery. Thus, the sentencing court did not abuse its discretion by determining that Ross's convictions for robbery and unlawful imprisonment were not the same criminal conduct.

> C.      ENG-YU-MOO RESIDENCE

The facts at the Eng-Yu-Moo residence were similar with regard to Ross's criminal intent. One robber held the occupants of the home at gun point while the other searched the house for valuables to steal. Also like the incident at the Fernandez residence, Ross and his accomplice tied

Eng up and kept her and other residents confined to a room while one of them searched for valuables.

The same analysis outlined above, therefore, applies to the robbery and unlawful imprisonment of Eng. However, Ross was only convicted of robbing Eng. His convictions for unlawful imprisonment of Yu, Moo, and Cui, therefore, had different victims. Two crimes may only constitute the same criminal conduct if they involve the same victim, so these crimes were each separate instances of criminal conduct. *Walker*, 143 Wn. App. at 890.

We conclude that the district court did not abuse its discretion.

## STATEMENT OF ADDITIONAL GROUNDS

### I. CONFRONTATION CLAUSE

Ross contends that his Sixth Amendment confrontation clause rights were violated when the court allowed a witness's testimony as evidence without his attendance. However, the court did not admit any hearsay statements made by the witness. Therefore, Ross's contention fails.

### II. FIREARM SENTENCING ENHANCEMENTS

Ross assigns error to the jury instructions, claiming the State "improperly imposed firearm sentencing enhancements due to erroneous jury instructions." SAG at 2. Ross provides no further argument or context regarding this alleged error. Nor does he inform this court of the nature and occurrence of the alleged error. RAP 10.10(c). We are not obligated to search the record in support of claims made in Ross' SAG. RAP 10.10(c); *State v. Thompson*, 169 Wn. App. 436, 493 & n.195, 290 P.3d 996 (2012). Accordingly, we decline to consider the issue.

### III. DOUBLE JEOPARDY

Ross argues that the State violated his protection from double jeopardy by "charg[ing him] with multiple counts for the same offense." SAG at 3. He contends there "should be a merger due

to one offense that took place to further the other." SAG at 3. Ross made an identical argument in his brief and it is addressed above. Where a SAG contains alleged errors that "have been thoroughly addressed by counsel," they are "not proper matters for [the] statement of additional grounds under RAP 10.10(a)." *Thompson*, 169 Wn. App. at 493.

IV. DETECTIVES' TESTIMONY AND DESTRUCTION OF NOTES

Ross argues that "the detective's testimony should have been inadmissible" because "(1) the detectives didn't agree with each other in the[ir] testimony on the stand. (2) [T]heir testimony changed. (3) Detective Baker destroyed his notes." SAG at 3.

A. DETECTIVES CONTRADICTORY TESTIMONY

As to the detectives' contradictory testimony, Ross provides no further argument or context regarding this alleged error. Nor does he inform this court of the nature and occurrence of the alleged error. RAP 10.10(c). We are not obligated to search the record in support of claims made in Ross's SAG. RAP 10.10(c); *Thompson*, 169 Wn. App. at 493 & n.195. Accordingly, we do not address this issue.

Insofar as the detectives did contradict themselves or one another, "[c]redibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). We generally "defer[s] to the trier of fact on conflicting testimony, witness credibility, and the persuasiveness of the evidence." *State v. Raleigh*, 157 Wn. App. 728, 736-37, 238 P.3d 1211 (2010).

B.    DESTRUCTION OF NOTES

Ross also assigns error to Detective Baker's destruction of the notes he took during his interview with Ross. In *State v. Carol M.D.*, the court addressed a detective and a Child Protective Services workers' destruction of their interview notes. 89 Wn. App. 77, 92-93, 948 P.2d 837 (1997) *withdrawn in part on other grounds*, 97 Wn. App. 355, 983 P.2d 1165 (1999).

"Dismissal of criminal charges is the remedy for the State's destruction of evidence only if (1) the State fails to preserve *material exculpatory* evidence or, (2) in the exercise of bad faith, it fails to preserve *potentially useful* evidence." *Carol M.D.*, 89 Wn. App. at 93. In *Carol M.D.*, like in this case, the investigators destroyed their interview notes after preparing "their formal written reports of the interview." *Carol M.D.*, 89 Wn. App. at 93. Also like *Carol M.D.*, the record contains no indication that the destroyed notes were either material and exculpatory or potentially useful. *Carol M.D.*, 89 Wn. App. at 93. The investigators in that case "stated their notes were not verbatim; they did not contain the specific questions they asked M.D. . . . Both men also testified their reports included everything in their notes." *Carol M.D.*, 89 Wn. App. at 93.

In this case, Baker testified that Griffith "had already used [his] notes and at that point they were no longer needed." RP (Aug. 19, 2013) at 79. He also testified that he believed that "everything that was contained in [his] notes is contained in Detective Griffith's report." RP (Aug. 19, 2013) at 98. However, Baker also testified that he did not recall whether his notes included any information about Ross' Percocet addiction or whether Baker had discussed Percocet pills with Ross.

Ross has certainly not shown that Baker's notes would be materially exculpatory. Neither has he shown that they contained information about Ross' Percocet use. Accordingly, we conclude that Ross' rights were not violated.

27

V.    ARGUMENT ON DISPROPORTIONATE SENTENCE

Ross claims that he "received an unconstitutionally disproportionate sentence." SAG at 2.

However, Ross' sentences were within the standard range for each of his crimes. As a general rule, a defendant cannot appeal a standard range sentence. *State v. Osman*, 157 Wn.2d 474, 481, 139 P.3d 334 (2006). Appellate review is available only if the trial court "failed to comply with procedural requirements of the SRA or constitutional requirements." *Osman*, 157 Wn.2d at 481-82.

Here, Ross does contend that his standard range sentence was "unconstitutionally disproportionate." SAG at 2. The Washington Constitution provides that "[e]xcessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." WASH. CONST. art. I, § 14. *State v. Korum* set out a test for determining whether a punishment violates Article I section 14 that considers four factors: "(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions for the same offense, and (4) the punishment meted out for other offenses in the same jurisdiction." 157 Wn.2d 614, 640, 141 P.3d 13 (2006).

Like the defendant in *Korum*, Ross has offered "no evidence why the nature of his offenses does not support a lengthy sentence." 157 Wn.2d 640. Ross has also failed to prove that his sentence does not reflect the legislative purpose "to significantly increase punishment for certain multiple offenders, particularly those who were armed." *Korum*, 157 Wn.2d at 641. Lastly, Ross has produced nothing to show how "punishment in other jurisdictions or for other offenses in Washington compare to his sentence." *Korum*, 157 Wn.2d at 641. Accordingly, we conclude that Ross's sentence is not unconstitutionally disproportionate.

VI.    SIXTH AMENDMENT RIGHT TO AN IMPARTIAL JURY

Ross argues that "[h]e was denied his Sixth Amendment right to an impartial jury."  SAG at 2.  Ross provides no further argument or context regarding this alleged error.  Nor does he inform this court of the nature and occurrence of the alleged error.  RAP 10.10(c).  We are not obligated to search the record in support of claims made in Ross' SAG.  RAP 10.10(c); *Thompson*, 169 Wn. App. at 493.  Accordingly, we decline to consider the issue.

VII.    PROSECUTORIAL MISCONDUCT—POWERPOINT PRESENTATION

Ross alleges that "the prosecutor's use of a [PowerPoint] demonstration during closing arguments constituted misconduct."  SAG at 2.

Contrary to Ross's argument, "[a]ttorneys may use multimedia resources in closing arguments to summarize and highlight relevant evidence, and good trial advocacy encourages creative use of such tools."  *State v. Walker*, 182 Wn.2d 463, 476, 341 P.3d 976 (2015).  Ross does not argue any specific act of misconduct other than the "use of a [PowerPoint] demonstration."  SAG at 2.  Ross has not shown prosecutorial misconduct.

VIII.    CUMULATIVE ERROR

Ross argues that "cumulative error denied his right to a fair trial."  SAG at 2.

Where a trial contains multiple errors, "[c]umulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless."  *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  However, this "doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial."  *Weber*, 159 Wn.2d at 279.

Here, the only errors at trial were the prosecutor's improper closing arguments and those were remedied by the trial court sustaining the defense objection.  Ross has not demonstrated any

other errors that combined would amount to cumulative error requiring reversal. Cumulative error did not deprive Ross of his right to a fair trial.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Melnick, J._

Melnick, J.

We concur:

_Johanson, J._

Johanson, J.

_Maxa, A.C.J._

Maxa, A.C.J.